**PHARR v. UNITED STATES.**

No. 5697.

Circuit Court of Appeals, Sixth Circuit.

April 15, 1931.

L. E. Gwinn, of Memphis, Tenn., for appellant.

J. A. Wharton, Sp. Asst. to Atty. Gen. (Lindsay B. Phillips, U. S. Atty., and Herbert L. Harper, Asst. U. S. Atty., both of Memphis, Tenn., and Nugent Dodds, Sp. Asst. to Atty. Gen., on the brief), for the United States.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge.

Appellant was a dealer in cotton and a customer of the Union & Planters' Bank & Trust Company, of Memphis, Tenn., a member bank of the Federal Reserve System. Beauchamp was a vice president of the bank in charge of its cotton department. The two were jointly indicted, Beauchamp as principal and appellant as aider and abettor, for misapplying the funds and credits of the bank. Beauchamp entered a plea of nolo contendere and was sentenced to imprisonment. Appellant pleaded not guilty, and was tried and convicted on each of the nineteen counts of the indictment. On this appeal he assigns numerous errors, the first of which is that the trial court should have directed a verdict of not guilty.

The several counts of the indictment may be considered in three groups. All of them relate in part to a pre-existing indebtedness of appellant to the bank. The indebtedness arose in this way: In the spring of 1923, the Memphis bank, through New Orleans, New York, and Boston banks, advanced money to appellant to buy cotton to fulfill contracts he had made in Germany. The cotton was bought and shipped, but upon its arrival in Germany was rejected—apparently for good cause. Upon the rejection of the cotton the out-of-town banks demanded their money. Beauchamp, acting for the Memphis bank, paid it and took over the securities held by those banks. The securities consisted of the cotton itself, which in the meantime had declined in value $50 or $60 a bale. Appellant was without means to pay this indebtedness, and to sell the cotton, if it could be sold, would result in a loss of more than $500,000, and perhaps wreck the bank. With the hope that appellant could earn enough to take up the indebtedness, Beauchamp, without consulting the finance committee or the higher officers of the bank, agreed to furnish him the money to buy low-grade cotton. It was in pursuance of this plan, presumably, that appellant drew the drafts alleged to have resulted in the misapplications charged.

Prior to June 11, appellant, in carrying out his arrangement with Beauchamp, had bought considerable cotton and issued drafts therefor on New Orleans banks. When these drafts, with bills of lading attached, arrived

in New Orleans, there was no money in the banks to pay them. In order to raise the necessary funds appellant drew drafts through the New Orleans banks on his Memphis office which were forwarded to the Memphis bank for collection. He had no credit or funds in the Memphis bank, and as the drafts had no cotton back of them Beauchamp had no color of excuse for paying them. The cotton had then reached New Orleans, and had been stored in warehouses and warehouse receipts issued to the banks holding appellant's drafts. Knowing this, Beauchamp and appellant hit upon the plan of borrowing the warehouse receipts, giving trust receipts therefor to the New Orleans banks, and using the warehouse receipts as collateral on other drafts. This they did, with the result that on June 11 and 13 appellant drew three drafts through Beauchamp's bank on the French American Banking Company, New York, and the Equitable Trust Company, New York, aggregating in amount $263,498.59, and attached thereto the warehouse receipts. Beauchamp immediately credited the drafts to appellant's account, and paid checks which he drew on the account to take up the drafts in New Orleans. The warehouse receipts were not released by the New Orleans banks until two weeks later. Between June 13 and 27 appellant sold the cotton, and upon the release of the receipts attached them to other drafts. The three drafts drawn on the New York concerns were never presented for payment and were never paid by appellant. They form the bases of counts 8, 9, and 10.

Counts 1, 2, 3, 4, 5, 6, 7, 16, 17, 18, and 19 form a second related group. Nine of them relate to payments of drafts drawn on E. F. Hutton & Co., New York, and the other two to drafts drawn on Blythe & Bonner, New York, all between July 30 and October 12. All of these drafts had attached to them bills of lading for cotton. They were never forwarded for collection nor intended to be forwarded. The cotton was of low grade, some of it not marketable at all, and in some cases not shown to have been in existence. Typical of most of these transactions is the one covered by count 3 in which the draft for $43,842.60 was secured by 260 bales of cotton that actually cost $10,388.08. There was no record on the books of appellant showing he had ever owned or dealt in the cotton supposedly pledged as collateral to the drafts involved in counts 6 and 7, amounting to more than $45,000. The cotton purporting to be back of the draft involved in count 5, amounting to $42,500.00, was found in Bremen, Germany, at the time the bank was liquidated, having been shipped there by appellant, consigned to himself, and undisposed of. All the drafts, with the exception of those involved in counts 16, 17, 18, and 19, were charged off by the bank as losses. The last-mentioned drafts were taken up by new drafts issued on the same cotton, and these were also charged off as losses. The misapplications were alleged to have occurred upon the payment of the original drafts.

The remaining counts, 11, 12, 13, 14, and 15, which we designate as group 3, involve drafts aggregating $81,733.60, covering the period from March 6 to 15, 1924, inclusive. These drafts were drawn by appellant in New Orleans upon himself, accepted and credited to his account in Memphis by Beauchamp, and the credits checked out. While each of them appeared on its face to be secured by cotton, there was in fact no cotton behind any of them, so far as was shown by appellant's books, and none was found by the liquidating agent of the bank.

Pharr was insolvent on June 11, 1923. He and Beauchamp both knew this. Both knew the drafts which the bank paid were either not secured at all or were not sufficiently secured, and both resorted to artifice and deception to make it appear on the books of the bank that the transactions were regular. That it was necessary to resort to these deceptions to get the money seems obvious when it is remembered that appellant then owed the bank more than a half million dollars and had no assets or property except an equity in his home. The evidence tends to show, it is true, that at some point in the course of his dealings with the bank he gave to it such additional security as he could by pledging this equity in his home with his wife's equity in a plantation, the two, as he claims, being worth $125,000. This, however, is not important, for it does not appear that any substantial sum, if indeed any sum, was ever realized from the sale of these equities, and in any event, the cotton back of the drafts, plus the equities, fell far short of affording adequate collateral, as both appellant and Beauchamp must have known.

 It is claimed that there was no misapplication of the funds because the proceeds of the drafts were used to pay the old indebtedness due the bank. We do not find from our examination of the record that the funds withdrawn on any single draft were turned back in toto to the bank in part payment of the indebtedness existing prior to

June 11; nor do we find that in every case or a majority of the cases they were not. The government seemed content to rest its case upon the ground of withdrawal of the funds upon fictitious and false collateral, regardless of the disposition. It is stated by counsel for appellant, and not denied by the government, that appellant's indebtedness to the bank in the end, after all the drafts aggregating $598,910.82 had been paid, was less than his indebtedness on June 11. The record is not clear as to that, nor does it show what disposition was made of the proceeds of all the drafts. It is certain that some of them were used to buy other cotton, and it is perhaps true, too, that in the course of buying and selling appellant paid into the bank something more than the total amount of the drafts. Presumably these payments were made in part from profits and were in part a return of the funds obtained for trading. In view, however, of what seems to have been the substitution of a large part of the later indebtedness for a like amount of the old, it must have been that the entire proceeds of some of the drafts were applied to the old indebtedness. As to those drafts there was a mere substitution of one worthless piece of paper for another, and hence no misapplication. Robinson v. United States, 30 F.(2d) 25 (6 C. C. A.). In thus holding that the substitution of one worthless piece of paper for another does not amount to misapplication of funds we are not to be understood as saying that such an act might not be punishable under 12 USCA § 592 as a falsification of records where the intent was to mislead the officers of the bank or the agents of the comptroller into a false belief that the new paper was secured by adequate collateral, although it was known not to be so. As to those drafts where the proceeds were not applied on the old debt, but were used by appellant in his business, we do not doubt that there was a misapplication within the meaning of the statute. The record is too incomplete to permit of our determining which counts are brought by the proofs within the one or the other of these classes.

█ It is contended by appellant that, even though misapplication was proved, there was no evidence of an intent to injure or defraud the bank. It is said that it was appellant's intention, if successful, to repay the money and to pay all the old indebtedness. Assuming this to be true, there was none the less a resort to false pretenses to get money from the bank which otherwise could not have been got. In the Robinson Case, 30 F.(2d) 25,

27, this court said: "When a bank officer misapplies the money of the bank, intends the misapplication, and for that purpose gets the money out of the bank by any kind of a false pretense, the inference of intent to injure or defraud, in the statutory sense, cannot be avoided"—citing Galbreath v. United States, 257 F. 648 (6 C. C. A.); and further: "It would not be controlling if the new loan were perfectly good and collectible, the deceit and fraud would remain." In the present case the means used to take the funds out of the bank were so far beyond the bounds of legitimate banking as to imply an intent to injure or defraud; indeed, there seems no room to question the existence of this element of the offense as to those counts where the misapplication was shown.

█ Error is assigned to the conduct of counsel for the government in interrogating appellant about a plea of nolo contendere that he had entered to the indictment but had withdrawn. Counsel first asked appellant if he had not entered a plea of guilty. Appellant answered: "You say that I pleaded guilty," to which counsel replied: "Yes, you entered the same plea that Mr. Beauchamp did." Appellant then said: "I certainly have never pleaded guilty," whereupon counsel replied: "You pleaded nolo contendere, didn't you?" Appellant then stated he understood that was a denial of guilt, to which counsel replied, as if he were surprised or questioned the veracity of appellant: "You understood that the plea of nolo contendere was a denial of guilt?" To this appellant answered: "A denial of guilt." Without having objected to the questions, counsel for appellant at this point intervened and requested the court to withdraw the jury and enter an order of mistrial. This motion was overruled after the court had instructed the jury to disregard the questions and answers. For all practical purposes, the plea of nolo contendere is one of guilt. United States v. Norris, 281 U. S. 619, 50 S. Ct. 424, 74 L. Ed. 1076. To have permitted the government to prove that appellant had entered such a plea and withdrawn it would have been reversible error. Kercheval v. United States, 274 U. S. 220, 47 S. Ct. 582, 71 L. Ed. 1009. Although the questions and answers referred to were not objected to, the motion to discharge the jury was made in time to raise the question of error. The effect of the examination was to bring home to the jury the equivalent of a confession of guilt. Whether a reversal is required depends on whether such a fixed impression was made on

the minds of the jury as to influence its verdict. Standing alone without further interpretative reference, it might have been that the questions would not have been prejudicial; but both counsel for the government and the court elsewhere in the trial treated the plea of nolo contendere as one of guilt. Proof of Beauchamp's plea had been made, and the court, in charging the jury that it could not convict appellant of aiding and abetting unless it found that Beauchamp, the principal, had violated the law, stated: "Presumptively Beauchamp did violate the law, for the record in this case shows that in this very case he entered a plea of guilty, or nolo contendere, and was sentenced by this court." Moreover, counsel for the government, in his concluding argument, stated that Beauchamp, "indicted with" appellant, had "entered a plea * * * and served his sentence." These statements served to emphasize the improper conduct of counsel, and in such circumstances we cannot think that the admonition of the court had the effect of removing the harmful impression made by the inadmissible facts. Because of this misconduct on the part of counsel, the judgment must be reversed.

As there must be another trial of the case, we deem it proper to call attention to other errors which should be avoided on the retrial. The references by counsel for the government, in his concluding argument, to the misfortunes of women, widows, and orphans resulting from the wrecking of the bank were in no sense pertinent to the presentation of the issues of the case, and were highly improper. The courts have uniformly condemned arguments of this character, the sole tendency of which is to defeat a fair trial. Again, we think the court erred in charging the jury that Beauchamp "presumptively" violated the law. This statement was made in defining the offenses with which appellant was charged, that is, the offense of aiding and abetting. Obviously, as the court said, unless the jury found that Beauchamp had misapplied the funds, it could not find that appellant had aided and abetted him. It was necessary that both facts be found. Beauchamp's plea to the indictment was admitted in evidence without objection. Whether upon objection being made it should not have been received is a question not presented and therefore not decided; but see Kirby v. United States, 174 U. S. 47, 19 S. Ct. 574, 43 L. Ed. 890, and Havener v. United States (C. C. A.) 15 F.(2d) 503. In our opinion, even though admissible, it carried

no presumption of his guilt as against appellant.

Other errors assigned by appellant have been considered by the court, but found to be without merit.

For the reasons stated, the judgment is reversed, and the cause remanded for a new trial.