(No. 23918.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANNA H. WHITE, Plaintiff in Error.

*Opinion filed February 18, 1937.*

ARCHIE G. KENNEDY, and DENNIS J. COLLINS, for plaintiff in error.

OTTO KERNER, Attorney General, LATHAM CASTLE, State's Attorney, A. B. DENNIS, and LOWELL B. SMITH, for the People.

Mr. CHIEF JUSTICE HERRICK delivered the opinion of the court:

On June 5, 1935, the grand jury returned an indictment of seven counts in the circuit court of DeKalb county against the defendant, Anna H. White. The first count charged the defendant with forging the name of George E. Clarke to a promissory note for $6500, dated March 1, 1933, payable to her order. The remaining counts charged her with uttering, publishing and passing the alleged forged

note. On a trial before a jury the defendant was found guilty on all counts. After the motion for new trial was overruled and before judgment was pronounced the People *nolled* the forgery count. The defendant was sentenced on the remaining counts to the State Reformatory for Women at Dwight. She brings the record here for review.

Numerous grounds for reversal are urged. The major ones will be treated in the course of the opinion. The defendant insists the evidence is such that it will not sustain a verdict of guilty. The record is voluminous. The gist of the evidence will be set forth so far as we deem material.

George E. Clarke was a bachelor seventy-six years of age when he died testate on September 1, 1934. His next of kin were nephews and nieces. These, some charitable institutions and friends were the beneficiaries under his will. Two nephews are the executors. Some of the relatives live near Sycamore. Clarke never made his home with any of them. The deceased came to Sycamore when he was a small child. He lived on a farm near that city all his life. In later years he made his home with Olin Farr, a tenant on one of the farms owned by the deceased. His estate was valued at approximately $150,000 at the time of his death.

The defendant has lived in Sycamore all her life. She was formerly a stenographer. Her first position was in 1909, when she entered the employment of E. S. Earley, an attorney practicing at Sycamore. In that office she became acquainted with Clarke, who was a client of Earley's. Earley and the defendant were married in 1913. She continued her work in the Earley office until his death, in 1916. A daughter, Grace, was born of the marriage. The defendant was employed in the law office of C. D. Rogers and George Brown in 1919. From there she entered the service of the wire and cable company hereinafter mentioned. She worked there until 1931 but not as a stenographer. Some years after Earley's death she married Edgar

J. White. From about the time she became acquainted with Clarke she did stenographic work and book-keeping for him. In his later years Clarke suffered severe pain from a disease which affected his feet. In the fall of 1931 he sustained a traumatic injury to one of his heels, from which he never fully recovered. This accident aggravated the diseased condition of his feet. Later some of the toes from each foot were amputated.

The defendant's evidence is that in February, 1931, Clarke asked her to quit her employment at the factory and work for him. She objected, telling him she would lose her group insurance and a chance for a pension. He told her she would be taken care of. Upon his request she finally ceased work at the plant in March of 1931 and thereafter rendered services to Clarke until the time of his death. Following the time she quit her job at the factory he called at her home from two to five times a week to have his work done. She also rendered services in treating his feet and attempting to relieve the suffering which they caused him. He owned six farms, which he rented. He had large sums loaned on notes and mortgages. She kept the accounts of the farms and the loans, made inventories of his chattels, indexed and filed his mortgage notes and writings. She also wrote, at his dictation, a history of Mayfield township, that being the township where Clarke had grown to manhood and had spent most of his life. There is evidence tending to corroborate her statement about her work. In April, 1916, following Earley's death, Clarke advanced her $1600 by two checks with which to liquidate some of the indebtedness of the Earley estate. She stated this loan was re-paid when she sold certain of her deceased husband's real estate. There is no evidence contradicting the payment.

Mrs. White testified that Clarke paid her for the first four or five months' services which she performed for him while employed in the Earley office. Clarke then told her that this was money that she had earned as "extra" money,

and that she ought to make arrangements with Earley or himself, save the money and keep it all together; that he would invest such savings for her. Thereafter he did not pay her. She further testified that she received $1000 out of her husband's estate, which sum she delivered to Clarke in 1917 and for which he gave her a receipt dated March 1, 1917. She received $600 rentals in $50 monthly installments, which she delivered to Clarke as the same accrued. He gave her a receipt dated March 1, 1918, for the $600. In February, 1933, Clarke told her that he wanted to make a settlement with her; that he had invested her money in stock of the wire and cable company; that it had doubled and trebled in value, and he was giving her the benefit of the increase for the work she had done for him. He thought $6500 would be a fair amount, for which he would give her his note. He told her his reasons for giving a note rather than paying her the money. She detailed what he stated were his reasons. She related that he came to her home on March 1, 1933, shortly after the noon hour, produced the note in question, the blanks of which had already been filled in typewriting. He signed the note, using his fountain pen. He handed the note to her, saying it was for her services and the money he had had of hers. She noticed the signature was not distinct and called his attention to that fact. He picked up a reading glass from the table, examined the signature and agreed that it was not clear. She then filled his fountain pen. He thereupon placed a paper weight on a portion of the note, and, using the reading glass, he re-traced his signature. Julia Johnson, a sister of the defendant, made her home with the defendant. She corroborated the testimony of the defendant as to when, where, and the manner of the execution and delivery of the note. The defendant's grown daughter, Grace, saw Clarke at her mother's home on this day but was not in the room when the note was signed, although she saw it that same evening in her mother's possession.

Grace testified that Clarke told her in the fall of 1933 that her mother had been a good employee and that he had given her this note for her services and for the money of hers that he had had for investment. On receipt of the note Mrs. White surrendered to Clarke the two receipts above mentioned. He took them with him. The reading glass was introduced in evidence. The note bears an endorsement under date of August 27, 1934, that interest was paid thereon to March 1, 1935. The defendant testified that this was paid by Clarke's check. The check is in the possession of the executors but is not in evidence. The executors offered to prove on the trial that the check was procured by improper means. The trial court sustained objections to the offer.

The evidence tends to show that the deceased had a friendly interest in the welfare of the defendant and her family. She testified that in 1925 her husband saw Clarke and requested a loan to make repairs on their home. Clarke saw the defendant alone, told her he had not known White so long and wanted to know how she felt about the loan. He told her he would take her husband's note. He could re-pay the debt and leave the defendant's money with Clarke intact. The loan was made for $500, evidenced by a note dated September 25, 1925, due three years after date, with interest at six per cent, secured by mortgage on the home in Sycamore. This note was renewed on February 24, 1928, for $672.23. It included additional money obtained to pay for the expense of a goitre operation performed on Mrs. White. The renewed loan was likewise secured by the note and mortgage of White and his wife. The more recent note bears twenty endorsements written by Clarke, showing payment at sundry dates of various sums on the principal and interest, reducing the principal to about $200. The mortgage securing the $500 note bears this endorsement, all written by the hand of Clarke:

"The note described in this mortgage is lost but unassigned to any person whatsoever and the ownership of said note rests in me absolutely. Now therefore, I, in consideration of the war record of Edgar J. White in France, hereby cancel and release the aforementioned Edgar J. White from the said ———— to any person whatsoever.

G. E. Clarke.

"Dated November 10, 1933."

A portion of the note for $672.23 is missing. It is clear that the absent portion bore writing thereon. Written across the remaining part, in Clarke's writing, is a portion of an apparently similar endorsement as above quoted bearing the same date and signed by Clarke. Formal releases signed and acknowledged by Clarke under date of November 10, 1933, of the two mortgages, are in evidence. The proof also shows a note for $60 given by the daughter, Grace, to Clarke on December 2, 1933, for one year, with interest at five per cent after maturity.

Paul Nehring established a manufacturing company in Sycamore in 1912. Clarke invested with him at that time $1000. He afterwards put in more money, but not to exceed $3000. He later took stock in the company amounting to about $15,000. This company was absorbed by the Illinois Wire and Cable Company. At the time of the merger Nehring negotiated a sale of Clarke's stock for about $100,000. Nehring also founded a manufacturing business at DeKalb. Clarke furnished him $5000 to start the industry. Alfred Clarke, a brother, also had $5000 invested in this industry. Late in 1921 George Clarke told Nehring that on account of his many interests he wanted to sell his stock. Nehring bought out the two Clarkes late in 1921 or early in 1922, paying them between $35,000 and $40,000 for their interests in the last named company.

On November 5, 1934, the defendant filed her claim for $7146 against Clarke's estate. The claim was based on the note in question, together with services from March 1, 1933, to September 15, 1933, $96; wages from September, 1933, to the date of the death of Clarke, at $50 per

month, $550. The claim was contested. On the trial in the county court that court found for the executors. From that judgment the claimant there, defendant here, appealed to the circuit court, where the cause is still pending.

To sustain the charges made by the indictment the People offered evidence tending to show Clarke's eyesight had been failing since 1931; that it was greatly impaired in 1933, so it would have been difficult for him to have traced his own signature. One witness testified that in paying a bill to him Clarke offered him two ten-dollar bills in the belief that they were one-dollar bills. As opposed to this type of testimony, there were checks written and signed by Clarke on the same day as the note in question. Other writings, and a letter written by him at about the same time, were produced in evidence. Olin Farr, the tenant, Dr. Ovitz, Dr. Bagnall, James D. Beckler and A. L. Stark, bankers, and Arthur O. Drake and William A. Clarke, the executors, each testified that in his opinion the signature in question was spurious. Beckler admitted on cross-examination that on the trial in the county court he first testified the signature was genuine. Paul Nehring, whose testimony on another branch of the case is hereinbefore stated, and William F. Wiltberger, an insurance and loan broker with whom Clarke did considerable business, and each of whom professed to be familiar with Clarke's handwriting, testified that in their opinion the disputed signature was genuine.

The People, without objection, put in evidence the inventory in the Clarke estate, together with Clarke's bank account from 1920 to his death. This account showed at all times that Clarke had sufficient money to pay the note. Also without objection, several witnesses testified that Clarke enjoyed a good reputation for paying his financial obligations punctually.

It was the theory of the People that the controverted signature was a traced signature, made by placing a sheet

of carbon over the note in question and then placing a genuine signature of Clarke's on the carbon paper. By tracing the genuine signature superimposed upon the carbon paper a purported signature was reproduced upon the note. This supposed signature was thereafter re-traced in ink. Two professional handwriting experts testified for the People that the signature was a traced carbon signature. One professional handwriting expert testified for the defendant that the signature was not a traced carbon signature. From a comparison made by him of the questioned signature with genuine signatures, he gave as his opinion that the challenged signature was written by the same hand that wrote the signatures conceded to be true. Another expert witness, a consulting chemist, testified for the defendant that the signature was not written over carbon. He had not made a chemical test but had made other tests which he said were reliable and accurate. Based upon these tests he stated that those portions of the signature which the People claimed showed carbon were not carbon but were ink.

After the claim was filed, the two executors, who were nephews of the deceased and beneficiaries under the will, called at the home of the defendant, interrogated her about the note and the circumstances under which she secured it. They testified to some statements alleged to have been made by the defendant tending to contradict her testimony in the present trial. She denied making the statements.

The evidence clearly discloses that Clarke was inclined to be rather liberal with some of his close friends. He had loaned money for Farr secured by a second mortgage on a farm. During the depression the value of the security disappeared so far as the second mortgage was concerned. Clarke obtained the title to the farm and later gave it to Farr. Farr is also a beneficiary under the will. There is also evidence that Clarke had signed a note for $5000 for one of his brothers, then in life. That afterwards he gave

the widow of his brother some money to help her when she was in financial need.

In cases of this kind the testimony of competent and unbiased experts may be very helpful to both the court and jury in arriving at the justice of the case, (*Oliver* v. *Oliver,* 340 Ill. 445; *Lyon* v. *Oliver,* 316 id. 292;) but their evidence is to be subjected to the same tests applicable to other witnesses. The record shows the defendant's counsel made a strenuous effort in cross-examination to learn what compensation one of the professional experts for the People expected to be paid for his services, or what his contract, if any, was therefor. This witness consistently evaded answering the questions and the cross-examination upon that subject was fruitless. While the compensation paid an expert witness and the circumstances of his employment are not controlling and do not necessarily discredit the witness, yet these are facts which are proper to go to the jury, to be considered by them, with the other facts and circumstances in evidence, in determining the amount of credit to be accorded the testimony of such witness. A professional expert witness should not be a partisan. His function is to give truthful testimony upon and about the matters upon which he may be interrogated. His sphere is not that of an advocate for the side of the controversy by which he is employed. *Opp* v. *Pryor,* 294 Ill. 538, 545.

An assistant State's attorney was appointed for the trial of the case at bar on the motion of the State's attorney. The assistant so appointed apparently took active charge of the trial. He had also represented the executors on the hearing on the defendant's claim in the county court.

The county clerk was the first witness called for the People. In responding to a question asked by the assistant State's attorney he stated he had in his possession the order of the probate court in connection with the claim filed by the defendant against Clarke's estate. The following question was next put to the witness: "Is that the original

order executed by the county judge, Judge McEwen?" The answer was, "You mean the order entered on the day of the disallowance of the claim?" The assistant State's attorney replied, "Yes." The witness then answered, "Yes, I have." Defense counsel objected and asked to have the answers stricken. The objection was sustained, answers stricken, and the jury instructed by the trial judge to disregard the questions and answers. Notwithstanding the effort of the trial judge to cure the error, the assistant State's attorney then stated: "Now, the question was as to whether he had in his possession the original order of the county court." The court immediately again instructed the jury to "erase" from their minds the questions and answers, saying that they were highly improper. Another question was then asked as to whether such case was determined in the probate court. Objection was sustained to this question.

In the presence of the jury, while one of the professional experts for the People was on the witness stand, he was asked whether he could make tests in the presence of the court and jury that would show whether there were carbon marks under the ink signature on the note in question. Objections made to the questions were sustained by the court. The assistant State's attorney then said to the court, in the presence of the jury: "I am offering now to make definite proof and I am asking to have this witness demonstrate or develop before the jury, with the use of chemicals, both those propositions that were put to him; he can make the test as to whether or not there were carbon paper marks under the signature or whether there is carbon ink in the signature." The defense objection to this statement was sustained. During his argument this same attorney said to the jury: "Mr. Rounds [defense witness] admitted that a chemical test would disclose whether it was carbon paper or carbon ink, or whether it was blue ink, and the other side then made an objection to our making a demonstration or test in the court room without experts to determine

whether that signature on that note would be subject to a chemical test." The defense objection to the foregoing was sustained. This argument was an invitation to the jury to conclude that the court's ruling was erroneous in upholding the objection and that the making of the objection was an indication of a lack of confidence on the defendant's part in her case. It was a request to the jury to discredit the trial court's ruling. Again the same attorney said in his argument to the jury: "Mr. Rounds testified that * * * he testified for the defense as a handwriting expert in the Loeb-Leopold case, but I say to you gentlemen of the jury, what price glory when a man will sell his services in that kind of a case, with little Bobby Franks mutilated and lying in his grave." Objection to this statement was sustained by the court.

The development of the fact before the jury that the probate court had disallowed the defendant's claim based on the note, the argument to the jury relative to a ruling made adversely to the People's offer to make certain demonstrations and tests before the jury, the utterances with reference to the sale of the witness Rounds' services in the Loeb-Leopold case and "little Bobby Franks mutilated and lying in his grave," were severally grossly prejudicial to the rights of the defendant to a fair and impartial trial. Nor were any of the errors cured by the court telling the jury, in some instances, to disregard such improper matters. The human mind does not lose its power of memory nor its function of thinking merely because it is in the jury box. The individual's emotions are not destroyed when he becomes a juror. The juror may be ever so honest, but it is not easy for him to forget matters which appeal to his passions and emotions. It is likewise difficult to prevent such circumstances, either consciously or unconsciously, from affecting the ordinary juror in the consideration of the case on trial. *People* v. *Schneider,* 360 Ill. 43; *People* v. *Maria,* 359 id. 231; *People* v. *Deal,* 357 id. 634;

*People* v. *Cepek,* 357 id. 560; *People* v. *Hamilton,* 268. id. 390.

The legislature has declared it to be the policy of this State that a State's attorney should not be employed, except for the public, in a civil case depending upon the same state of facts on which a criminal prosecution shall depend. (State Bar Stat. 1935, chap. 14, sec. 6a, p. 150.) A State's attorney has an obligation both to the People and to the defendant. Trial courts should be reluctant to appoint as a special State's attorney or assistant State's attorney one who represents private interests in pending civil litigation growing out of the same state of facts as is presented in the criminal case in which he is appointed prosecutor. The errors pointed out were not cured by the rulings of the trial court nor by its instruction to the jury to disregard the improper statements. *People* v. *Rogers,* 324 Ill. 224; *People* v. *Hamilton, supra.*

One of the handwriting experts for the People had stated that there were black flecks and blue lines in the disputed signature visible by the use of the microscope; that the black flecks were carbon and the blue lines ink. At the request of the assistant State's attorney the jurors, under the supervision of the witness, by means of the microscope made an examination of the controverted signature. Each juror as he looked at the signature was asked by the witness, in substance, whether he could see the black flecks and the blue line. Each juror replied yes. It is urged by the defendant that this interrogation of the jurors by the witness was improper. It was, but the defendant has not properly preserved the alleged error for review.

A book in which there were entries written by the hand of Clarke was produced by the executors and introduced in evidence by the People. When Farr was on the stand he testified that the item in this book, "(note delivered) A. W.," appearing between the entries made on December 7 and 8, 1933, (which was written by Clarke,) was not in the hand-

writing of the deceased. Sufficient proof was not made to admit the book generally as an account book. Other pages of the book were offered as a standard of the writing of the deceased. Over the defendant's objection the jurors took this book to the jury room with them. It is argued that there is no proof that the jury saw the forbidden pages. The People must have had some point in mind in making the proof as to the entry written in the book of the deceased. There was nothing to prevent the jurors from making the examination. Their curiosity would naturally be aroused by the questions asked and the replies thereto. They should not have been tempted to inspect this page by taking the book with them. It would not require a vivid imagination to conclude that "A. W." stood as the initials of the defendant, Anna White. Nor would it demand a mind of more than ordinary acumen to reason that this entry referred to the condemned note; that its delivery to the defendant in December was in positive contradiction of her testimony and that of her sister as to when, where and the circumstances under which the note was delivered. It was also repugnant to the testimony of the defendant's daughter, Grace, as to when she first saw the note in her mother's possession, and her statement that the defendant told her in the fall of 1933 that Clarke had given the note to her mother. It was prejudicial error to permit this book to go to the jury room. *Dunn* v. *People*, 172 Ill. 582, 590; *Rawson* v. *Curtiss*, 19 id. 456.

A large number of instruments bearing the admittedly genuine signature of Clarke were introduced in evidence as standards of the deceased's handwriting. The handwriting experts testified relative to the disputed signature by comparing it with the signatures conceded to have been written by Clarke. The defendant objected to these standards and the reading glass going to the jury room. The objection was overruled and the jury took all of these exhibits with them. The jury had the benefit of the evidence

of the witnesses who expressed an opinion of forgery by a comparison of the denied signature with the genuine signatures. In criminal cases the comparison contemplated by the statute is to be made during the reception of the evidence—not without the presence of the defendant. The jury had with it the reading glass, which they could use in comparing and examining the genuine signatures and the disputed one. The rule of evidence pronounced by the statute permits proof of handwriting by comparison, (State Bar Stat. 1935, chap. 51, par. 50, p. 1622,) but does not authorize in criminal cases the taking by the jury of standards of signatures from the bar of the court. It was reversible error to permit such exemplars to go to the jury room. *People* v. *Clark,* 301 Ill. 428.

Dr. Bagnall had examined the eyes of Clarke and testified to the condition of his vision on the occasion when he saw him and that he was suffering from diabetic retinitis. The doctor was shown the note in controversy and over objection permitted to testify that in his opinion Clarke could not have re-traced his signature on such note. This testimony was highly prejudicial. The question of re-tracing was not a medical nor a scientific one. There was no evidence that Clarke's nervous system was not normal. It was proper for the physician to detail Clarke's physical condition and the condition of his vision on the occasions when he saw him so the jury might have before them the state of the man in those respects, but the answer given invaded the province of the jury. This witness purported to decide by his opinion a material issue in the case. This he could not do. *People* v. *Rongetti,* 338 Ill. 56; *Baddeley* v. *Watkins,* 293 id. 394; *Keefe* v. *Armour & Co.* 258 id. 28; *Hoffman* v. *Tosetti Brewing Co.* 257 id. 185; *Schlauder* v. *Chicago and Southern Traction Co.* 253 id. 154; *Yarber* v. *Chicago and Alton Railway Co.* 235 id. 589; *Illinois Central Railroad Co.* v. *Smith,* 208 id. 608.

There was considerable evidence on the subject of tracing and re-tracing signatures. It was the evidence of the People that the ability to trace the signature depended on the skill of the tracer, his power of observation and control of his hands. In his argument to the jury the assistant State's attorney said: "When you gentlemen get into the jury room take this piece of paper and take a pen or pencil and write your own signature; trace this signature over here if you can and make it as perfect a signature as Mr. Clarke did this." The defendant objected to the statement, and suggested to the trial judge that jurors were not permitted to experiment with the signatures in the manner requested. The objection was overruled. It was not proper for the jurors to conduct experiments of this character outside of the presence of the parties. (*Yates* v. *People*, 38 Ill. 527; 16 R. C. L. sec. 111, p. 299.) What effect their own efforts, successful or unsuccessful, to trace a carbon impression of a signature or to write a signature with a pen which was practically dry and then re-trace it might have upon their verdict is unknown. Matters which may be wholly incompetent growing out of such efforts to trace or re-trace a signature may have materially affected the conclusion reached by the jury. The defendant would thus be deprived of the benefit of section 9 of article 2 of the constitution, which guarantees every defendant in a criminal case the right to "appear and defend" and "to meet the witnesses face to face." The effect of the court overruling the objection would normally convince the jury that it was perfectly proper for them to engage in such experiments, demonstrations and tests in deciding the question of the guilt or innocence of the defendant. Demonstrations and tests ordinarily are not permitted to be conducted in the court room even though in the presence of the jury and the parties. It follows that encouraging the jury to make such tests in the jury room outside the presence of the parties was highly improper.

Two instructions in identical language were given at the request of the People upon the subject of circumstantial evidence. The People say that this was an accident—that one was the original and the other a carbon copy. Regardless of what may have brought about this unusual situation, it was error to give duplicate instructions upon that subject.

Other errors are assigned, but we do not deem it necessary to pass upon them, although some have merit.

The record in the case at bar is not such as will sustain a verdict of guilty. Because of the errors herein pointed out, the judgment of conviction is reversed and the cause is remanded to the circuit court of DeKalb county for a new trial.

*Reversed and remanded.*