## UNITED STATES v. GRAYSON.

No. 136, Docket 20836.

Circuit Court of Appeals, Second Circuit.

March 4, 1948.

John W. Burke, Jr. and Davies, Auerbach, Cornell & Hardy, all of New York City (Homer W. Lane, of New York City, of counsel), for appellant.

John F. X. McGohey, U. S. Atty., for Southern District of New York, of New York City (Bruno Schachner and John J. Donovan, Jr., Asst. U. S. Attys., both of New York City, of counsel), for appellee.

Before L. HAND, SWAN and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Grayson was indicted in forty-three counts: twenty-two for fraudulent use of the mails;[1] twenty for violating the Securities Act of 1933;[2] and one for conspiring to commit the crimes laid in the earlier counts. At the conclusion of the evidence the judge withdrew from the jury a number of the charges of misrepresentation which together made up the fraudulent scheme, and dismissed a number of the counts; the jury convicted the accused upon all counts that were submitted to them, including the conspiracy count, which it will not be necessary to consider separately. The scheme which the prosecution sought to prove was to sell to customers interests in "royalties" in the Texas, Oklahoma and other oil fields, or to act as their broker in procuring "royalties" from others. It is the practise in these regions for the owner of the surface—the "tract"—to convey to oil companies the right to sink a well and withdraw the oil, or to reserve the right to a part of the oil upon conveying the fee in the "tract" to the oil company. The common arrangement in either case is for the oil company to account to the owner for one-eighth of the oil withdrawn, and this right is called a "royalty." In the case at bar all the "royalties" came from "tracts" on which wells had been sunk, and in all the wells were in active operation. The fraud charged may be stated generally as consisting of representing to customers that the "royalties," of which they bought fractional shares, had a longer prospective income producing power than they had in fact; that they were stable, dependable investments; that the cheques the customers would receive were "income"; and that the price they paid was less than the value of the interest received. Upon this appeal Grayson raises four

points: (1) that the trial was unfairly conducted; (2) that certain documents, called "Offering Sheets," which the judge admitted, were incompetent; (3) that certain other documents, which we shall speak of as "Sales Reports," which the judge excluded, were material and competent; (4) that the evidence did not support a verdict. We shall consider the fourth point first, because it requires an outline of the evidence which will make more readily understandable our discussion of the other three.

Towards the end of 1943 Grayson and three others entered upon a joint venture to buy oil "royalties," and sell them to customers, or to buy "royalties" for customers as brokers. They procured a list of persons, supposed to have investments—for the most part persons of small means—to whom they mailed a postcard, offering them gratuitous financial advice. Since the card itself contained no false statements, the prosecution relied upon what the partners told the customers at the personal interviews to which the card led. These representations were in general of the kind alleged in the indictment, and were amply proved at the trial by testimony of the customers. It is not necessary, in the view we take, to consider in detail what they were; for the purpose of the appeal we will accept Grayson's contention that they were all in the nature of recommendations of "royalties" as highly desirable investments, as insuring a reliable income over a long period of time—at times comparable with the customer's life—and as worth more than the price paid. (We can find nothing to justify the notion that the prosecution has abandoned the charge of misrepresentation as to value.) Moreover, not only did the testimony of the customers amply prove what was said to induce them to buy, but from the testimony of Grayson's confederate, Berman, the jury could have concluded that he did not believe what he and Berman professed to believe about the "royalties"; in short, if it was a fraud to inveigle the customers into purchases by hopes of profit which the confederates did not themselves entertain, there was evidence to support the verdict.

▇▇▇ As we understand it, Grayson's objection is not that the prosecution failed to prove what it set out to prove, but that opinions, promises, or representations as to the future, will not support a charge of fraud. We have repeatedly held the opposite.[3] Indeed, it has been the law ever since 1896,[4] that to promise what one does not mean to perform, or to declare an opinion as to future events which one does not hold, is a fraud. It is true that in Chaplin v. United States[5] the Court of Appeals for the District of Columbia by a divided court felt bound to hold otherwise in a prosecution for obtaining money under false pretences. We have recently refused to follow this ruling in a prosecution for evading the Selective Service Act 50 U.S. C.A.Appendix, § 301 et seq;[6] and certainly it has never applied to the statute for fraudulent use of the mails.[7] Biddle v. United States[8] was a prosecution for false pretences in the Consular Court of China, and was governed by the common law as it had been in 1789. The appellate court held that at that time to express an opinion as to the future was not regarded as fraud; and no doubt that was true, but the decision does not apply here. The question in civil cases is different; for, although a false opinion is equally a deceit, there are occasions on which the other party to the transaction relies upon it at his peril.[9] We hold that there was evidence to support the verdict; indeed, we will add that it would be hard to see how a jury could

[3] Knickerbocker v. United States, 2 Cir., 13 F.2d 544; Van Riper v. United States, 2 Cir., 13 F.2d 961; United States v. Rowe, 2 Cir., 56 F.2d 747; United States v. Uram, 2 Cir., 148 F. 2d 187.

[4] Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709; United States v. Comyns, 248 U.S. 349, 39 S. Ct. 98, 63 L.Ed. 287.

[5] 81 U.S.App.D.C. 80, 157 F.2d 697, 168 A.L.R. 828.

[6] United States v. Rubinstein, 2 Cir., 166 F.2d 249.

[7] § 338, Title 18, U.S.C.A.

[8] 9 Cir., 1907, 156 F. 759.

[9] Vulcan Metals Co. v. Simmons Manufacturing Co., 2 Cir., 248 F. 853; Goess v. Lucinda Shops, Inc., 2 Cir., 93 F.2d 449, 115 A.L.R. 264; Restatement of Torts §§ 542, 53.

have come to any other conclusion than they did.

In charging that the trial was unfair Grayson relies upon several incidents, of which we will first take up the three least important. One of these is that he was indicted under an alias, by coupling with the name, Grayson, his former name, Gellis, which had been lawfully changed. We can see no justification for the use of the alias, and the practise has been several times condemned.[10] No issue could come up as to Grayson's identity, and an alias— even a single alias—can serve no purpose but to arouse suspicion that the accused is a person who has found it useful or necessary to conceal his identity. Next, the receipt in evidence of the opinion of the Securities and Exchange Commission in Charles Hughes & Co., Inc. v. Securities and Exchange Commission was entirely proper; for Grayson and Berman had discussed the effect of this holding, and the extent to which they should guide their conduct by it. Last, to ask Grayson's expert whether some of his earlier clients had not been enjoined by a court, or whether their publication had not also been enjoined, was not reasonable cross examination; but Grayson did not object to the first question —though later he did move to strike it out —and the second question the judge ruled out. We see no reason to suppose that the prosecutor did not believe that the questions were proper, and in any event this was at most an irregularity. These three occurrences of which only two at most were improper, would not in our judgment even remotely tend to justify a reversal.

Some of the testimony brought out from customers was, however, more serious. We wish to distinguish, particularly in the light of what we said in United States v. Brown,[11] between what the accused says to his customers and what the customers say about their own circumstances, financial or personal. It often happens that what a customer tells of his interview with the accused, or what the correspondence beween them discloses, contains matters extremely damaging and likely to arouse the jury. In the case at bar such an instance was the testimony of one of the customers that during his efforts to induce her to buy "royalties" Grayson made amorous advances to her. That testimony was, however, entirely relevant,—despite the extravagant protest of the accused at the time, and apparently the judge's doubts —for it is never a ground of objection to evidence directly relevant to the crime that it exposes the accused to odium, or even implicates him in another crime. In this instance all that took place was part of the means by which the customer was to be induced to buy: although he was on pleasure bent, apparently Grayson had a frugal mind. It is true that a judge has discretion to rule out even relevant evidence if it is not cogent and is more likely to distract, than to inform, the jury; but that cannot be said of the very communications between the accused and his victims. So far as these incidentally arouse the hostility of the jury, he is without relief. Nearly all the evidence complained of falls under this head; but there were three instances that do not; and it is difficult altogether to justify the prosecutor in their introduction. First, we can find no reason for asking one customer whether he had a son in the service, after he had already testified that he had so told Berman. Second, it was certainly unwarranted to ask another customer whether what she paid was all that she had in the world. Third, it was unnecessary a second time to ask a customer whether she was married; and, when she coupled her second answer with the statement that her husband was in the service, it is hard to resist a doubt whether the addition may not have been expected. However, these even in conjunction would not justify reversal in so long a trial; and, so far as concerns the first and fourth points upon the appeal, we should affirm the judgment without hesitation. There remain the second and third: the introduction of the "Offering Sheets" and the exclusion of the "Sales Reports."

In order to prove that Grayson could not have supposed that the "royalties" were as

[10] Lefco v. United States, 3 Cir., 74 F.2d 66; D'Allesandro v United States, 3 Cir., 90 F.2d 640; United States v. Monroe, 2 Cir., 164 F.2d 471, 477.

[11] 2 Cir., 79 F.2d 321.

he described them, the prosecution relied chiefly upon an expert witness, named White. He had had experience of his own in the oil fields, and had been trained as an engineer; and he went to the fields where the "tracts" were situated on which the wells had been driven. While there he interviewed persons who were working in the fields and examined the installations on the ground. There are state commissions in Kansas, Texas, Oklahoma and elsewhere which are charged with the duty of reporting as to all the wells in operation in those states, and which file their reports with the Securities and Exchange Commission. The Commission also requires all "registered dealers" in oil "royalties" to file what are known as "Offering Sheets," which describe in a good deal of detail the wells "of which the dealer is offering to sell" interests in the "royalties." This information includes the company which is withdrawing the oil, a description of the oil field with its production and the number of wells; the oil withdrawn from the "tract" to date; the "prorated" allowance for the well and the monthly production for the past year. Several dealers testified as to the sources of their information; they may be taken as typical. At times they too received an "Offering Sheet" from the engineers, geologists or other dealers in the field, but it does not appear from what sources these had got their information. From the filed "Offering Sheets" along with other information, White prepared a tabulation on which appeared the prices at which Grayson had sold to twenty-two customers (one of whom appeared in each of the substantive counts of the indictment). the probable future return from the interest sold, as White estimated it, and the difference between the two. The purpose of this was to show that Grayson had sold at prices so far beyond any reasonable expectations that he could not have honestly believed what he told his customers. The judge excluded this exhibit, because confessedly White had in part made it from what he had heard from others on the spot. Thereupon over a week-end White prepared two new tabulations, based, as he swore, only on documents which he and the judge regarded as of themselves competent, among which, however, were the "Offering Sheets." All the documents which White used in making his tabulations and the tabulations themselves were then admitted, though of course none of the "Sheets" were available to which the registered dealers themselves may have resorted in making up their own "Sheets."

■ White, as a qualified expert, was entitled to form his opinion as to the future life of the "royalties"—and therefore indirectly as to their present value—from his personal observation and by recourse to any other competent evidence which was introduced at the trial; and it was proper for him to state in tabulated form his conclusions from all evidence properly in the case. We will assume that the reports of the state commissions were competent as official documents; in any event Grayson does not apparently challenge them. The judge received the "Offering Sheets" as also competent under the same exception to the hearsay rule. Official in one sense of course they were, for the dealers had filed them in obedience to a regulation of the Securities and Exchange Commission; but not all documents required to be filed by law are competent evidence of all that they record. The exception is confined to transactions of which it is not only the duty of an official to make entry, but which must themselves have come within his knowledge in the course of his duties.[12] Wigmore[13] extends the exception to transactions of the recording officer's subordinates, who perform their duties under his supervision; and it is hardly conceivable that this should not be right, although Great Northern Ry. v. Washington[14] may be thought to be the

[12] Chesapeake & Delaware Canal Co. v. United States, 3 Cir., 240 F. 903, 907; Nolte v. Hudson Navigation Co., 2 Cir., 16 F.2d 182, 184; Greenbaum v. United States, 9 Cir., 80 F.2d 113, 126; Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 572, 153 A.L.R. 156; Vanadium Corporation v. Fidelity & Deposit Co., 2 Cir., 159 F.2d 105, 109.

[13] 1635(2).

[14] 300 U.S. 154, 57 S.Ct. 397, 81 L. Ed. 573.

other way. For the purposes of the case at bar we assume that the exception goes so far, because it makes no difference. The dealers were not officials, the transactions they recorded had not come under their personal cognizance, and those who had first hand knowledge of them were not their subordinates. Section 661 of Title 28 U.S.C.A. merely makes certified copies of documents on file in a department equivalent with the originals. Our discussion is directed at the competency of the original "Sheets" themselves. Nor were the "Sheets" within the statute[15] making entries competent which are made in the regular course of business. True, it was part of the regular course of the dealers' business to prepare the "Sheets"; and they were no doubt competent evidence of the fact that the dealers were offering the "royalties" which the "Sheets" recorded. But the "Sheets" did not become competent evidence of the truth of all statements in them, because it was the course of the dealers' business regularly to record information which they got from others. In cases where an entrant records what he has heard, the document will be evidence of what they have told him only in case it appears that it was part of their regular course of business to report to him what the declarants themselves knew, as it was part of his business to record what they said. The statute did not mean to make competent whatever the entrant picked up from random sources, although it was part of his business to pick up information where and when he could and make a record of it.[16] The "act, transaction, occurrence or event" which the entrant records must be one of which either he has knowledge, or which he learns from a declarant who shall "in the course of the business transmit the information for inclusion in the memorandum."[17] "Multiple hearsay" is no more competent now than single hearsay was before.[18]

Nor was this the only error, for the "Sales Reports" should not have been excluded. These documents were required to be filed with the Securities and Exchange Commission by registered dealers in oil "royalties" for every sale made by them, and all contained the sale price. They were in two forms; one for a sale to a customer, the other for a sale to another dealer. Grayson issued a subpoena to the Commission to produce a number of reports of such sales, some of which related to interests in the same twenty-two "royalties" laid in the indictment. Of these one was in 1944, some were in 1942 and the rest were scattered back as far as 1936. He offered these in evidence, and proposed supplementing them by proving how much oil had been taken from the wells since the sales had been made. The prosecution objected to their receipt on two grounds: (1.) they were too remote to be material, and (2.) they were privileged because of regulations of the Commission which enacted that they "shall be kept confidential unless the Commission shall order otherwise."[19] The judge examined them, held that they were too remote to be relevant and excluded them; it does not appear that he made any ruling upon the question of privilege.

We do not think that they were too remote. It does not appear whether the sale in 1944 was of a "royalty" in which Grayson had dealt, although presumably it was, since he had included it in his subpoena. Be that as it may, we cannot say that those of 1942 or of even earlier years were without probative value. It is quite true that the value of a "royalty" in 1944 was not proved by showing how much oil had been taken out since the earlier sale had been made, even though one corrected the sale price by any changes in the price of oil. More important were the factors of "water encroachment" in the "tract," and the "decline curve" of the production of oil; but these had already appeared in

[15] § 695, Title 28 U.S.C.A.

[16] Massachusetts Bonding Co. v. Norwich Pharmacal Co., 2 Cir., 18 F.2d 934.

[17] Model Code of Evidence, Rule 514 (1) and Comment pp. 270, 271.

[18] Rule 502 Comment, Model Code of Evidence.

[19] Code Fed.Reg., Title 17, §§ 230.320 (e); 230.322(c).

White's testimony as to all the "tracts" laid in the indictment. It followed, so far as we can see, that the "Sales Reports" added all that was necessary—at least as to the "tracts" mentioned in the indictment—to form a comparison between the prices that Grayson had received, and those at which other fractional interests in the same "royalties" had been sold to others. It is not out of place to repeat what we said in United States v. Werner:[20] that when evidence has any substantial logical bearing on the issue, it is best to admit it, unless it interjects other and disturbing issues into the trial, which here was not the case. They were competent as to the sales price, because, unlike the "Offering Sheets," the price was a matter within the knowledge of the dealers and they were made in the regular course of their business. If they were incompetent for any reason, it was because the Commission's regulation made them "confidential." Although it does not appear that Grayson asked the Commission to "order otherwise," we hold that he was justified in supposing that the prosecution spoke for the Commission and that any request would have been denied. We have twice held that a conviction should not stand when the accused has been denied access to documents relevant to his defence, which are in the possession of a department of the Government, whose regulations make them unavailable at the trial.[21] We need not say that there can never be situations in which a privilege created by departmental regulation will not prevail, just as 't would prevail if Congress had created an unconditional privilege, or if the evidence was in the possession of a state official, who could not be compelled to produce it. Be that as it may, there is an obvious distinc-tion between documents held by officials who are themselves charged with the administration of those laws for whose violation the accused has been indicted, and those which are not so held. All we need to hold—and all we have held hitherto—is that when the privilege is conditional upon the consent of such a department, the prosecution will fail unless the officials are willing to produce them. We recognize no such incommunicability between officials of the same government; so long as they cannot administer the same law in accord, its penal provisions must remain in abeyance. Half the counts of the indictment charged violations of the Securities Act of 1933, over whose enforcement the Commission presides; the other half, though nominally for abuse of the mails, charged offences whose gravamen was the same. That put the prosecution and the Commission collectively to a choice, either not to suppress all evidence within their control which bore upon the charges, or to let the offences go unpunished.

Conviction reversed; cause remanded.

FRANK, Circuit Judge (concurring).

I agree that we must reverse for the reasons stated by my colleagues. I would, however, also hold that, even in the absence of the errors which they hold reversible, we should reverse because of (1) the needless use of the alias,[1] and (2) the three instances of testimony, by victims, the admission of which my colleagues describe as improper[2] but which they regard as harmless. Whether any one of those errors standing alone would be enough to require reversal need not be considered. But combined, I think they deprived defendant of a fair trial; they come within the recent

---

[20] 2 Cir., 160 F.2d 438, 443.

[21] United States v. Andolschek, 2 Cir., 142 F.2d 503; United States v. Beekman, 2 Cir., 155 F.2d 580.

[1] See United States v. Monroe, 2 Cir., 164 F.2d 471, 477.

[2] In United States v. Brown, 2 Cir., 79 F.2d 321, 324, this court said: "But we have never held that the witnesses should be allowed to go to such lengths as here, and plainly they should not. For example, the prosecution succeeded in getting before the jury that in consequence of their losses some buyers had lost their homes and their business, and gone hopelessly into debt; that they had lost everything including their friends, and were destitute; that their losses went into millions; that one unfortunate had committed suicide. Were the guilt of the accused not so irrefragibly shown, we could not affirm the judgment in the face of this, and we wish to make it clear that we have never given warrant to any such abuse. All we sanction is evidence that the property bought turned out to be worthless, or that it greatly fell in value."

rulings of the Supreme Court defining prejudicial as distinguished from harmless error.[3] The able and conscientious trial judge, patently troubled by this unfairness, once severly criticized government counsel out of the presence of the jury, regularly directed the improper testimony to be stricken, and gave disregarding instructions. I think, however, he should have gone further and declared a mistrial. For the objectionable answers, once given, had such a character that no one can say that the judge's warnings effectively removed their poisonous consequences.[4] Indeed, as experienced trial lawyers have often observed, merely to raise an objection to such testimony—and more, to have the judge tell the jury to ignore it—often serves but to rub it in. I believe that a prosecutor ought not deliberately and repeatedly, as here, put defendant's lawyer in such an awkward dilemma—where his client will suffer if the lawyer does not object or if he does. If, without attaching any practical consequences to such tactics of the prosecutor, we simply express disapproval of them, we do nothing to prevent their repetition at the new trial of this case or in trials of other cases.

### HUGHES et al. v. SAMEDAN OIL CORPORATION et al.

#### No. 3573.

Circuit Court of Appeals, Tenth Circuit.

March 10, 1948.

---

[3] Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Bihn v. United States, 328 U.S. 633, 66 S. Ct. 1172, 90 L.Ed. 1485; Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350; Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495, 156 A.L.R. 496; Bruno v. United States, 308 U.S. 287, 293, 60 S. Ct. 198, 84 L.Ed. 257.

[4] See, e. g., Judge Sanborn in Skuy v. United States, 8 Cir., 261 F. 316, 319; Towbin v. United States, 10 Cir., 93 F. 2d 861, 868; Latham v. United States, 5 Cir., 226 F. 420, 425; Pharr v. United States, 6 Cir., 48 F.2d 767, 770, 771; Volkmor v. United States, 6 Cir., 13 F. 2d 594, 595; Lockhart v. United States, 9 Cir., 35 F.2d 905, 906, 907; Middleton v. United States, 8 Cir., 49 F.2d 538,

Clifford E. Hughes, of Los Angeles, Cal. (Fletcher A. Catron, of Santa Fe, N. M., on the brief) for appellants.

J. O. Seth and Oliver Seth, both of Santa Fe, N. M., for appellees.

Before PHILLIPS, BRATTON and MURRAH, Circuit Judges.

540; Maytag v. Cummins, 8 Cir., 260 F. 74, 82, 83; Pierce v. United States, 6 Cir., 86 F.2d 949, 952, 953; Robinson v. United States, 8 Cir., 32 F.2d 505, 508; Beck v. Wings Field, Inc., 3 Cir., 122 F.2d 114, 117; Waldron v. Waldron, 156 U.S. 361, 383, 15 S.Ct. 383, 39 L. Ed. 453; People v. Levan, 295 N.Y. 26, 34–36, 64 N.E.2d 341, 345; People v. Fielding, 158 N.Y. 542, 53 N.E. 497, 46 L.R.A. 641, 70 Am.St.Rep. 495; People v. Ah Len, 92 Cal. 282, 28 P. 286, 27 Am.St.Rep. 103; Lickliter v. Commonwealth, 249 Ky. 206, 60 S.W.2d 355, 357; Cassemus v. State, 16 Ala.App. 61, 75 So. 267, 268; People v. White, 365 Ill. 499, 6 N.E.2d 1015, 1021. See also dissenting opinion in United States v. Antonelli Fireworks Co., 2 Cir., 155 F. 2d 631 at pages 655, 656.