GOESS v. LUCINDA SHOPS, Inc., et al.

SAME v. BLUMENTHAL.

Nos. 37, 38.

Circuit Court of Appeals, Second Circuit.

Dec. 6, 1937.

MANTON, Circuit Judge, dissenting.

450

Schwartz & Frohlich, of New York City (Louis D. Frohlich and Herman Finkelstein, both of New York City, of counsel), for appellant.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Martin Conboy, David Asch, and Hobart L. Brinsmade, all of New York City, of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

One of the suits was brought by the plaintiff as receiver of the Harriman National Bank & Trust Company to recover the amount due on a promissory note for $1,500 made by the defendant Lucinda Shops, Inc., on December 21, 1932, payable, and delivered, to the above-named bank and indorsed by the defendant A. D. H. Holding Corporation and by the appellant before delivery.

The other suit was on three causes of action; an overdraft on appellant's account with the bank to the amount of $3,560.78; a promissory note for $25,000 indorsed by the appellant; and an overpayment of $1,301.03 made on a continuing guarantee by the appellant to the bank on the account of defendant Lucinda Shops, Inc.

The appellant did not contest his liability on the causes of action alleged, but did rely upon three counterclaims, which were the same in both suits, alleging that he had been defrauded by the bank when he was induced to purchase of it 40 shares of its capital stock in 1930 by the false representations of its president; that appellant paid $59,185 for the 40 shares; and that upon discovering the fraud in 1933 rescinded the sale and demanded the return of the purchase price which was refused to his damage to the amount thereof.

The appellee answered the counterclaims with complete denials of the fraud, and the two actions went to trial together on the issue so raised and upon another raised by an amendment of appellee's answer alleging that the bank was closed on March 3, 1933; never thereafter opened; a conservator appointed on March 13, 1933; the bank declared insolvent on October 16, 1933; and a receiver appointed. It was contended that the rescission, which was after March 3, 1933, was in any event too late to be effective.

After trial on the merits, the court directed a verdict for the plaintiff for the amount due on his causes of action and dismissed the counterclaims on the ground that no fraud had been proved.

Apparently the defense to the counterclaims raised by the amendment was futile in view of Oppenheimer v. Harriman Nat. Bank & Trust Co., 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042, but we need not go into that, for the reason that a majority of the court agrees with the trial judge that the appellant failed to prove that he was defrauded when he purchased the stock and so had no just ground for rescission at any time.

The appellant dealt with J. W. Harriman, the president of the bank, in buying the stock. His grounds for rescission are that Mr. Harriman made false representations to him regarding the stock which induced him to buy it and failed to disclose to him that the bank and Harriman were artificially maintaining the price of the stock far above its actual value by "rigging" the market. The stock was an unlisted one bought and sold in small quantities. The purchases by the appellant were in three lots. On March 19, 1930, he bought 15 shares at $1,417 per share, which was charged to one of his accounts at the bank. On May 6, 1930, he bought 10 additional shares at $1,525 each and paid for them in a similar way. On October 24, 1930, 15 shares were purchased at $1,512 per share and paid for as before.

The evidence as to the representations made by Harriman to the appellant upon

which he relied in buying the stock is found in the testimony of the appellant himself and the following quotations show the gist of it:

"He (Harriman) first called me on the telephone and said that he would like to have me as a stockholder of the bank and that he thought he could get a hold of a small amount of stock, it was very difficult to get, and he would like to have me buy it.

"He also said that the stock would have a material increase in value and he thought it was a good investment and they were anxious to have some of their important depositors, stockholders, and I told him I supposed it would be all right to buy a few shares. Subsequently he deducted some money from one of the accounts and bought some stock. He told me it was worth considerably more than the price. He said it was selling for fourteen or fifteen hundred dollars a share or thereabouts—I have forgotten. He thought it was worth considerably more. I then authorized him to purchase the stock for me. I vaguely did. I didn't pay much attention to it."

He further testified that in response to a telephone call from the bank later when he talked either with Mr. Harriman, or with one of two vice-presidents, Mr. Austin or Mr. Noble, he couldn't remember, he bought 10 more shares in the same manner but didn't testify to any representations except that 10 more shares could be purchased. He further testified:

"I think I had another conversation with Mr. Harriman some time in the fall of the year. It was either September or October of 1930. I think it was prior to October 24th, 1930. The conversation was about the same thing, the same kind of conversation as the previous one. He urged me to buy some more stock. I bought it in the same manner. He gave me a very glowing idea of the value of the stock at that time. He said he thought in a year or so the stock would be worth about $3,000.00 a share." He said Harriman told him the stock was worth more than it was selling for, which was around $1,500 a share.

None of these representations upon which the appellant relied in making the purchases were shown to be wrong except those which were patently expressions of opinion. It appeared that actual current sales of stock took place from time to time during 1930 at prices around $1,500 per share. There was credible evidence substantially uncontradicted that the prices appellant paid for his stock were in 1930 fair and reasonable prices for it. At that time, of course, it was not known that the bank would succumb to the effect of the depression and mismanagement, and it would be far-fetched to believe from the evidence that even Harriman, though wrong as subsequent events proved, was consciously wrong in making the statements and predictions as to value over selling price which he made to the appellant in 1930. The reasonable conclusion is that in fact appellant did, as a matter of law he had to, take such expressions as to value as mere statements of opinion and prophecy and use his own judgment. Such statements will not support an action against the seller, for they do not amount to misrepresentations of existing facts. Vulcan Metals Company v. Simmons Mfg. Co. (C.C.A.) 248 F. 853; Kimber v. Young (C.C.A.) 137 F. 744; Lehigh Zinc & Iron Co. v. Bamford, 150 U.S. 665, 14 S.Ct. 219, 37 L.Ed. 1215; Hatton v. Cook, 166 App. Div. 257, 151 N.Y.S. 577.

Nor was there evidence to show rigging of the market to maintain the price of the stock in 1930. It did appear that it was customary for brokers who had any of the stock for sale to call the bank to try to get a firm bid from Mr. Harriman or a vice-president. Sometimes a bid was so obtained and sometimes not. Sometimes only part of the stock was so sold. But this was but an easy way, perhaps, for the brokers to dispose of what they had for sale. No agreement between them and the bank was shown. One broker testified to purchases and sales of some 150 shares of the stock during the year at prices from $1,350 to $1,605 per share which were "regular sales in the market, the over-the-counter market, regular sales. * * * These are perfectly straight, legitimate sales. I can give you the names of the customers." It appeared that in 1930 the bank declared and paid dividends amounting to $35 a share on its stock, a foolish move in the light of later events, but at that time it was a matter for the exercise of the discretion of its board of directors. There is no evidence of bad faith upon which the declaration of those dividends

**452**

may be questioned in this case. Liebman v. Auto Strop Co., 241 N.Y. 427, 150 N.E. 505. And so there was insufficient evidence to make a case for the jury on the issue of fraud.

■ Some evidence was excluded. The rulings of exclusion are relied on for reversible error. Conversations between Harriman and appellant after all the stock had been purchased by the appellant were offered to show that appellant had been dissuaded from selling the stock. The theory was that this would show the fraudulent intent of Harriman in making the representations which led the appellant to buy. But, as we have seen, no actionable misrepresentations were shown, and it obviously would have added nothing to show that Harriman still retained and asserted his opinion that the stock was a good investment.

■ An offer was made of what is called a concession of fact made by the attorney for this plaintiff in the trial of an action against one Ehret in which appellant argues that it was conceded that the market for Harriman National Bank & Trust Company, stock was rigged; that there was no real market; and that the stock had practically no value. We find that the concession relied on was not of that nature, but merely that Ehret would in his case testify, if called, that he had discovered facts "tending to show" what was claimed, as above stated, about rigging the market and lack of value of the stock. Certainly this was no concession by the plaintiff that the facts were as claimed or that Ehret's testimony would establish them to be so. It was merely a concession to make unnecessary the calling of a witness in another case to which this appellant was not a party and whose testimony, even if it had been given in that case, could not have been introduced here as a concession of any material fact by this plaintiff.

Upon a review of the entire record, a majority of the court believes that no reversible error has been made to appear.

Judgment affirmed.

MANTON, Circuit Judge (dissenting).

Appellee sued to recover on two promissory notes and overdraft in the Harriman National Bank & Trust Company of the City of New York and on a guaranty. To these undisputed claims the appellant has filed counterclaims. It is therein alleged that the bank, by false representations and by manipulating the market in its own stock, induced the appellant, Blumenthal, to buy its stock in 1930 which turned out later to be worthless. Appellant demanded rescission and return of the purchase price of the stock. The court below directed a verdict for the appellee and dismissed the counterclaim. The evidence establishes, sufficiently for a jury's consideration, that the bank was manipulating the market in its own stock. It had a trader in bank stocks, Corwin & Co., constantly in touch with the market for its shares. This firm specialized in "over-the-counter" trading, and the record establishes that, whenever stock was offered for sale, the market was supported by the bank's offering to purchase it through these brokers. Appellant says that this constituted a material misrepresentation of fact as to the value of the stock. If the bank had not supported the market and made the purchases, its shares might well have had a precipitous drop in price which would have put the appellant on his guard. One of the members of the firm testified to a series of transactions occurring between January, 1930, and December 17, 1930, during which time the stock was maintained at a price varying from $1,350 to $1,500 and a few shares as high as $1,600. The method of offering stock for sale was for the trader to call the officers of the bank and ask for a bid on the stock before any sale in the stock was made. They would bid, first instructing the trader to urge the seller not to sell but retain his stock. He testified: "Several times they urged me to urge my customers not to sell it as they were going to do something which would make the stock worth considerably more money."

Sometimes they "would not make a bid for as many shares as we would have for sale," in which case his firm would turn over to another broker those shares not taken by the bank from Corwin & Co., and that other broker would then offer the remainder of the lot to the bank. Presumably the bank did not know that the stock offered them by the second broker was part of the lot which Corwin & Co. had offered them originally. From this course of dealing it would be reasonable

to infer that the bank was taking only a few shares out of each block put on the market in order to insure price maintenance with a minimum expenditure of its own funds. It is also reasonable to infer that the dealers in the stock may have been aware of this, and thus they may have split allotments of the stock amongst various dealers, each of whom would offer a few shares to the bank. A witness said that "It was the invariable practice of our firm to offer every share of this stock to the Harriman Bank." It appears from his testimony that he would tell the officers of the bank how much stock he had received for sale, and at these times the bid might be delayed, but in most instances was made and the stock sold to the bank.

In March or February, 1930, the bank's president telephoned to appellant, Blumenthal, and said he would like to have him as a stockholder of the bank; that he could get a small amount of stock which was difficult to get, and he would like him to buy it. He said the stock would have a material increase in value and he thought it was a good investment and was anxious to have their important depositors stockholders. The first purchase was on March 12, 1930, 15 shares at $1,417 a share; the second on May 6, 1930, 10 shares at $1,525; and the third on November 24, 1930, 15 shares at $1,-512 a share—a total of $59,185.

At the time that the bank officials represented to the appellant that the stock was scarce and that they were selling it to him only because they valued him as an important depositor and they were conferring a special favor upon him by giving him a special invitation to become a stockholder, their own affiliate, Harriman Securities Company, was selling its stock to others, and they were supporting the market in the purchase of the stock sold. See Oppenheimer v. Harriman Nat Bank & Trust Co., 301 U.S. 206, 207, 57 S.Ct. 719, 81 L.Ed. 1042.

The 40 shares were never delivered by the bank to the appellant, and therefore he did not tender their return to the bank, but in May, 1933, he wrote rescinding the sale of the stock because of fraud and false representations and demanded the return of his purchase price.

Although the appellant bought his stock direct from the bank instead of via the market, Harriman in negotiating the sale informed him as to the market price of the stock. This testimony of a member of the trading firm was neither contradicted nor denied, and therefore stands unimpeached. There was sufficient evidence to support a finding that the bank was creating an artificial market in its own stock and that this was done with the fraudulent purpose of aiding the efforts to bolster the bank and unload its shares on the public.

The value placed upon the stock during the year 1930 by the Clearing House examiner the jury might have found to be erroneous. We may take note of the depression which came in October, 1929. Morris-Poston Coal Co. v. Comr, 42 F.2d 620 (C.C.A.6). This bank endeavored to make a better showing in its capital and surplus accounts in 1930, even though it was not justified by its actual earnings or by financial conditions. The Clearing House report showed the estimated value of the stock of the bank at the time to be $4,394,000, with 20,000 shares issued, or a price per share of $219.70. The value placed on the stock by an examiner of the New York Clearing House in 1930 was upon the basis of a payment of $35 per share on a par value of $100. However, a jury could well say that a dividend of $35 a share was unwarranted at that time.

The common law dealt with manipulation of the market long before the Securities Exchange Act (15 U.S.C.A. § 78a et seq.) appeared. That statute is not, of course, decisive of this case, since it was enacted subsequent to the transactions here in issue. However, the problem of manipulation at common law is important, for that statute, instead of supplanting the common-law remedies available to one injured by market manipulation, gives additional remedies supplementary thereto. 15 U.S.C.A. § 78bb. The gist of the decisions at common law seems to be that interference with a free market is actionable. "Matched orders" and "washed sales" support a civil suit by an injured party (Willcox v. Harriman Securities Corp., 10 F.Supp. 532 [D.C.S.D.N.Y.]; Miller v. Barber, 66 N.Y. 558; McElroy v. Harnack, 213 Pa. 444, 63 A. 127. So also do they give rise to criminal liability (U. S. v. Brown, 5 F. Supp. 81 [D.C.S.D.N.Y.]; People v. Far-

son, 244 N.Y. 413, 155 N.E. 724; section 953, N.Y.Penal Code; cf. Rex v. De Berenger, 3 M. & S. 67, 105 Eng.Rep. 536 [K.B.1814]), and the continuance of such practices may be enjoined in New York under the Martin Act (McKinney's General Business Law, § 352). The theory of the "wash" sale cases seems to be that such tactics constitute a fraudulent misrepresentation of fact in that the public is led to believe that the market price is a true and accurate one. In the instant case there was no showing of "wash" sales, but, as has been pointed out, the evidence does indicate manipulation by means of actual purchases by the bank of its own shares. But the principle is the same in both cases, since in each there is a representation that the quoted prices were arrived at in a "free" market. In both instances this representation is false since, instead of a market price made by the free play of economic considerations, there is an artificial price foisted upon the public by duplicity. In each situation the injured party should have his remedy.

It is not necessary to condemn all efforts to support the market price of a stock; no such case is presented here. No doubt situations have arisen and will continue to arise where such a policy is justifiable as, for example, to protect stockholders from a "bear" raid or in order to insure a market when a stock is first introduced to the public on an exchange. See Landon v. Beiorley, 10 Law Times, 505 (1848). A reasonable and honest purpose should be an adequate shield to the innocent. See Sanderson and Levi v. The British Westralian Mines & Share Corp., 43 Sol.J. 45 (1898), affirmed London Times, July 19, 1899, also reprinted in U. S. v. Brown (D.C.) 5 F.Supp. 81, 90. Cf. Scott v. Brown, 2 Q.B. 724 (1892).

The problems inherent in manipulation of securities have been dealt with in Europe as well as in the United States and England. Nussbaum, American & Foreign Stock Exchange Legislation (1935) 21 Va.L.Rev. 839. As early as 1896 Germany enacted a comprehensive Exchange Act (Reichsgesetzblatt 1896, p. 157, as amended May 27, 1908, Reichsgesetzblatt 1908, p. 215), which fought vigorously against manipulation of security prices, and made it a criminal offense to "use, with fraudulent intent, deceptive means aimed at influencing market and exchange quotations of commodities or securities" (Boersengesetz, § 88, par. 1). See, also, article 419 of the French Code Penal, as amended by statute of December 3, 1926.

An agreement to support the market by actual purchases or by withholding stock from the market is unenforceable and void. Harper v. Crenshaw, 65 App.D.C. 239, 82 F.2d 845; Bacciocco v. Transamerica Corp., 2 Cal.App.2d 595, 38 P.2d 417; Scott v. Brown, supra. In Singleton v. Harriman, 152 Misc. 323, 272 N.Y.S. 905, affirmed 241 App.Div. 857, 271 N.Y.S. 996, the court held that manipulation by actual purchases would justify recovery to the injured party. See also, Jaskow v. Harriman Natl. Bank & Trust Co. 159 Misc. 39, 287 N.Y.S. 143, 147. "The gravamen of the complaint here is that the corporation, by placing and keeping its stock on the market, had represented that it is subject to an open market appraisal, and having done so, has substituted for the open market appraisal an artificial appraisal, other than that which would be reached were the market 'free'." Berle, Liability for Stock Market Manipulation (1931), 31 Col.L. Rev. 264, 277. See, also, Moore & Wiseman, Market Manipulation & The Exchange Act, 2 U. of Chi.L.Rev. 46, 50. "There is a tendency of the courts, even independently of the Securities Exchange Act, to hold illegal, pool operations of a manipulative or deceptive character." Meyer, The Law of Stock Brokers & Stock Exchanges, p. 85 (vol. 2, 1936 Suppl.). Manipulated prices are not determinative of value for tax purposes. Appeal of Wallis Tractor Co., 3 B.T.A. 981; Parker v. Comr, 11 B.T.A. 1336. Supporting the market such as here practiced is a form of price fixing akin to that dealt with in the anti-trust acts. See U. S. v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989.

For a corporation to trade in its own shares as was here done places it in a position opposed to the fiduciary duty which it owes to its own shareholders, with all the advantages in such dealings on the side of the corporation.

Due to the important part played in our economy by the market and the exchange, a sound public policy requires preventing manipulative duplicity. This has

been recognized by some of the leading exchanges themselves.[1]

The counterclaim presented an issue of fact for the jury's determination.

I dissent.

---

[1] See Constitution of N. Y. Stock Exchange, art. 17, § 2; Rules of N. Y. Stock Exchange, c. XIV, § 15, adopted February 13, 1934.