## DELLEFIELD v. BLOCKDEL REALTY CO., Inc., et al.

### No. 219.

Circuit Court of Appeals, Second Circuit.

May 6, 1942.

See, also, D.C., 1 F.R.D. 689.

Nathan Friedman, of New York City (James Male, Maurice V. Seligson, and Irving J. W. Marx, all of New York City, on the brief), for appellants.

Isidor Lazarus, of New York City, for appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

In this action plaintiff, the widow of Albert S. Dellefield, suing individually and as administratrix of her husband's estate, has recovered a generous verdict and judgment—over a quarter of a million dollars all told—for a deceit which rests in final analysis upon her word against the word of the two individual defendants. The circumstances call for close scrutiny of the extensive record before us. From our study we are convinced that several important errors occurred which make unsupportable the verdict obtained from the jury and the judgment thereupon rendered.

Plaintiff's claim is that on September 28, 1935, defendant Louis Block, supported by his wife, defendant Lillian H. Block, represented that the stock of defendant Blockdel Realty Co. was worthless, and that upon that representation she assigned 50

shares to the company, and her husband, president and director of both defendant corporations, assigned 25 shares of defendant Third National Realty Corporation to defendant Louis Block.

The jury found for plaintiff as to the Blockdel transaction in the sum of $178,-000, and for plaintiff as administratrix as to the Third National transaction in the sum of $11,000, in each case against all four defendants jointly and severally; and the court entered judgment thereon, together with interest and costs, to make a total with reference to Blockdel of $238,-647.50, and with reference to Third National of $14,740. Further as to the Third National transaction, it also held that the same money judgment should be entered on an additional count for equitable relief, limited, however, to a single recovery. The court also entered judgment upon the jury's verdict finding against Blockdel's counterclaim for $15,783.84, alleged to be due it as a debt from the deceased.

Plaintiff's testimony was that her husband had been in a hospital early in September, 1935, afflicted with an illness which the doctors pronounced as probably fatal, and that she wished to take him back to their old home in Chicago. A few days before their trip she appealed to Louis Block, the other active officer of these companies and both a close business and an intimate personal friend of herself and her husband, for advice as to what she should do, particularly as to obtaining money. She asked for some money "on my stocks." He advised her that the Blockdel stock was worthless, but that he would take it and hold it, as it might be worth something in some time to come and might be good for Calvin, her minor son; and as to the Third National stock owned by her husband, that also was of no value, but he would pay back the money invested in it by Dellefield, to wit, $2,500 (on its recent organization the previous spring). He also said that, since Al (Dellefield) would not be able to do his work as when in the office, "they" would have to cut his salary from $200 to $100 a week. This conversation took place, apparently on September 24, in the Dellefield living room and out of the husband's hearing. Block then said he would have to get the stock certificates out of the Blockdel safe; and on September 28, just shortly before the Dellefields started for Chicago, he returned with them and asked her to sign the transfer. They were then in the sickroom. Her husband had been given morphine, but was awake and in control of his senses. She asked her husband what she should do, and he responded that anything Lou (Block) said to sign was all right. And Mrs. Lillian Block, also present, told her not to worry and that Lou would take care of everything. Then she signed the assignment on the back of her Blockdel certificate, dating it September 24 because Lou told her to put in the date they first talked about the matter; and her mother, Mrs. Perlman, signed as a witness. Dellefield then signed the assignment of his Third National certificate, and both certificates were delivered to Block.

Limited corroboration of plaintiff's testimony came from Mrs. Perlman and the nurse. Both recalled the signing of papers on September 28, but neither knew any details of the transaction. The nurse remembered only that "they" asked plaintiff if she knew what she was signing, that she said yes and then asked Mr. Dellefield if it was all right and he said that anything Lou said to sign was all right for her to sign. Mrs. Perlman remembered little other than that plaintiff said to Mr. Block that she was leaving everything to him, that Mrs. Block said they would take care of everything for her, that Mr. Block said the same, and that Mrs. Block said that plaintiff should trust them and everything would be all right and that they would take care of everything. On the other hand, both Mr. and Mrs. Block took the stand and, while admitting the farewell visit, denied that any such conversation took place. But when Mr. Block attempted to testify that the transfer took place on September 24 under an arrangement he was making with Mr. Dellefield, the court excluded all such evidence under circumstances more fully discussed below.

It was conceded by all, and shown by documentary evidence, that plaintiff's certificate was thereafter treated as assigned to the Blockdel Co., and the stock therein as treasury stock, while an entry of credit in the sum of $5,000 was made to the account which Dellefield owed the corporation. As to the Third National, the certificate was cancelled and a new one in a like sum of 25 shares was issued to Louis Block, who paid $2,500 therefor— $1,000 by checks directly to Dellefield, after he reached Chicago and $1,500 to Dellefield's father, thus paying a loan which Dellefield had obtained on his original purchase of the stock.

Dellefield did not then die, but recovered sufficiently to do considerable work for the company and to return to New York from time to time, being there for one considerable period from July, 1936, to February, 1937. His salary, which was reduced from $200 to $100 a week, was increased to $175 when he returned to work; but when he became sick again it was reduced to $75 and then finally to $50 a week, which amount he received until his death early in 1939. He continued as president of both companies until the summer of 1937, when, at Block's request, he submitted his resignation. The Dellefields and the Blocks remained intimate during this period, and more than one hundred letters passed between the families showing the same close affection as before. During all this time no claim was ever made by the Dellefields as to any of the matters above stated; and although Dellefield in several letters had occasion to plead for the continuance of his salary in response to Block's suggestions for a reduction or discontinuance, he invariably limited his plea to his immediate needs and his hope of still rendering the company service. As a matter of fact, he did some advertising designing for both companies even after he had finally left New York and did a certain amount of work, the details of which are somewhat disputed, for other concerns in Chicago. After his death plaintiff made no claim until September, 1939, when, as she says, she first learned of the imposition upon her and that the corporations were valuable properties. Defendants relied strongly on the fact that Dellefield continued to participate in the affairs of the company, signing checks, income tax statements, and the like, until his resignation as officer, as well as on other circumstances discussed below which, it is claimed, show both the propriety of the transaction and its complete acceptance by Dellefield throughout his life and by plaintiff until after his death. As has appeared, the jury, however, accepted plaintiff's version.

Some background facts must also be stated. Prior to 1926, Louis Block, Sol Koff, and August P. Sargol had been in partnership in the real estate business in Chicago. Dellefield, then in the advertising business in Chicago, had done advertising and other work for the partnership. The partners decided to organize a business in New York City for the purpose of buying land in Bergen County, New Jersey, improving it with streets, sidewalks, and sewers, subdividing it into building lots, and selling such lots on the installment plan. An agreement was then made by the partnership with Dellefield whereby he was to go east as active manager of the new business; and early in 1926, Blockdel Realty Co., Inc., was organized under the laws of the State of New York, with capital stock of $20,000. Of the 200 shares authorized, each of the three partners took 50, while the other 50 were allotted to Dellefield under a further agreement that if 75 per cent of the lots originally laid out were sold in a certain period of time the stock should be his. This contract also provided for Dellefield's employment as officer, general manager, and sales manager of the company for a five-year term, with a provision for resale of his stock to the company, if desired or if the employment was terminated during its term, at $100 a share. The accountant for the company set up as a charge against Dellefield the face value of this stock, to wit, $5,000, which is the original entry of the corporation's account with Dellefield. Dellefield was chosen president and director and managed the business until some two years later, when Block also moved to New York, serving first as vice-president and later, after the withdrawal of Sargol, also as secretary.

In May, 1929, Block and Koff arranged to buy out Sargol as a part of the process of winding up the affairs of the Chicago partnership, and in consequence Sargol's stock was assigned in equal shares to them. In March, 1932, Block transferred his 75 shares to his wife, Lillian. In August, 1933, Dellefield transferred his 50 shares to plaintiff. Thereafter Koff, who had gone into the real estate business in California, entered into negotiations with Lillian involving his 75 shares, as well as certain claims for salary and loans, resulting eventually in the outright transfer of his shares to Lillian Block in the spring of 1935. This transaction will require further consideration below on the issue of damages, for plaintiff contended, and the jury evidently found, that the purchase was made with corporate funds, so that the stock became treasury stock, leaving the entire ownership of the corporation in September, 1935, 40 per cent or 50 shares in plaintiff's name, and 60 per cent or 75 shares in the name of Mrs. Block. Defend-

ants claim the sale was bona fide and hence that Mrs. Block then owned 150 shares to plaintiff's 50.

In the spring of 1935, the Third National Realty Corporation was organized to engage in similar business in New Jersey subdivisioning, sharing offices with Blockdel; and Dellefield and Block each put up $2,500 and received 25 shares of the total capital stock of $5,000. When Dellefield resigned as president and director of the companies in 1937, Block succeeded him and became the sole active manager of the businesses.

Errors pressed on this appeal concern the sufficiency of the evidence as to any deceit, the ruling excluding the Block version of the affair, the nature and sufficiency of the evidence as to the value of the stock as proof of damages, together with the exclusion of certain evidence on this issue and the charge of the court with respect to it, and the nature of the judgment entered.

■ (1) *Sufficiency of the Evidence.* As has appeared, plaintiff's claim must rest upon Louis Block's statement that the stock in question was worthless. True, this was accompanied by an agreement to take over the stock and hold it for the eventual benefit of plaintiff's son. Plaintiff might have counted upon this contract; and, indeed, among the several different counts of her complaint were allegations to this effect. Nevertheless she chose to rely upon her claims for deceit—a wise decision, as the course of the litigation to date indicates. She therefore could not rely on any breach of contract or any claim for refund of the stock, and the court properly refused her any relief on these inconsistent claims. Hence her recovery must be for damages for the deceit by which she lost her own stock and her husband lost his stock. Any promissory representations are therefore eliminated, except as background for her substantive charge of misrepresentation of the value of the stock.

■ Defendants assert that statements as to value are only opinion, and not properly the foundation of an action for deceit. Gordon v. Butler, 105 U.S. 553, 558, 26 L.Ed. 1166; Hatton v. Cook, 166 App. Div. 257, 259, 151 N.Y.S. 577; Ellis v. Andrews, 56 N.Y. 83, 15 Am.Rep. 379; Goess v. Lucinda Shops, Inc., 2 Cir., 93 F.2d 449, 115 A.L.R. 264; 38 Col.L.Rev. 1110. While this may be generally true,

it is recognized that under certain circumstances such representations may be actionable, as where they are put forth as a definite statement of fact by a party having superior or perhaps exclusive knowledge to one without such knowledge and misrepresent the actual views of the maker. People ex rel. Gellis v. Sheriff of Westchester County, 251 N.Y. 33, 36, 37, 166 N.E. 795; Sautter v. Fulmer, 258 N.Y. 107, 179 N.E. 310; Von Au v. Magenheimer, 126 App.Div. 257, 110 N.Y.S. 629, affirmed 196 N.Y. 510, 89 N.E. 1114; Taylor v. Burr Printing Co., 2 Cir., 26 F.2d 331, 334, certiorari denied 278 U.S. 641, 49 S. Ct. 36, 73 L.Ed. 556; 21 Minn.L.Rev. 643. Plaintiff herself testified to her complete faith in, and reliance upon, Block's business judgment and advice; and while there was other evidence indicating greater shrewdness on her part, nevertheless this was a question for the jury. Under the circumstances we think that if the jury believed her testimony as to her relations with Block and found further that the statement was false and made knowingly with intent to deceive her, it was entitled to award her damages as to the Blockdel stock against Louis Block.

■ With reference to Lillian Block, the evidence is, of course, not so direct, and plaintiff's statement as to Lillian's presence in the room somewhat varied under the different examinations to which she was subjected. (All the principals were examined at length before as well as at the trial.) Nevertheless the evidence of Lillian's assurances to plaintiff that the latter could rely upon Lou seems sufficient to justify the submission of her complicity with her husband to the jury. It is true that the charge of the court was not very illuminating or adequate on this point. It occurred after a long and tedious trial of nearly three weeks, and merely allowed the jury to lump Mrs. Block and the Third National "as active agents lending themselves to a conspiracy to defraud." But a jury issue was made out as to her.

■ The issue as to the corporations is much more doubtful. Later we discuss the Third National transaction more fully; here we need say only that Block surely had no apparent or actual authority from either corporation to make misrepresentations on his private purchase of the Third National stock, nor did he have such authority from the Third National as to his

purchase for Blockdel of Blockdel stock. The only claim here made is that Block used the two corporations indiscriminately as he chose for carrying on his private affairs, and that they were merely extensions of his own personality. But the evidence, certainly in the period up to September 28, 1935, does not support this contention. The two corporations appear as active and separate entities, with Dellefield as president and stockholder, or proxy for his wife as stockholder, a major figure in their operations. The testimony of the bookkeeper of the two corporations showed that, while corporate offices were shared and there was some interchange of bookkeeping items, yet all these items were regularly adjusted and due accounting made in the books of each corporation. Defendants' motions for directed verdicts as to Third National, and as to Blockdel on plaintiff's claim as administratrix, should have been granted.

As to Blockdel's liability for Block's alleged misrepresentations as to the Blockdel stock, the situation is somewhat different, because Blockdel received the assignment of the stock and an offsetting credit of $5,000 was made on Dellefield's account with Blockdel. The corporation therefore received the benefit of the transaction and would undoubtedly have been responsible for the proceeds, had the suit been for a refund and had plaintiff proved her case. In an action for deceit, however, we have the same question noted above as to the scope of Block's apparent authority to commit a tort for Blockdel. The authorities on this point are not overhelpful. Fraud of a corporate president in making a lease has been held unauthorized, Stoneman v. Fox Film Corp., 295 Mass. 419, 4 N.E.2d 63, 107 A.L.R. 989, with note at page 996; and compare, as to the authority of a bank cashier with respect to bank stock, Bailey v. Union Nat. Bank of Knoxville, 159 Tenn. 659, 21 S.W.2d 393, 66 A.L.R. 1447, with note at page 1450. But a corporation is liable for the fraud of its officer within the apparent scope of his authority, Engen v. Merchants' & Manufacturers' State Bank, 164 Minn. 293, 204 N.W. 963, 43 A.L.R. 610, with note at page 615, and may make "incidental misrepresentations" as to matters where he is authorized to act. Restatement, Agency, §§ 257, 258. Here there would seem to be no apparent authority initially in the corporate secretary to buy up and retire corporate stock, an issue of course intimately connected with the controversial question as to when a corporation may buy its own stock. City Bank of Columbus v. Bruce, 17 N.Y. 507, 508; Topken, Loring & Schwartz v. Schwartz, 249 N.Y. 206, 163 N.E. 735, 66 A.L.R. 1179; In re Fechheimer Fishel Co., 2 Cir., 212 F. 357, certiorari denied 234 U.S. 760, 34 S. Ct. 777, 58 L.Ed. 1580; 35 Col.L.Rev. 971; 15 Minn.L.Rev. 1. On the other hand, the corporation had and retained the benefit of this action. It would seem, therefore, that this might relate back and make the original act binding upon the corporation; but perhaps no final decision is necessary at this time, for on a new trial the question of authority may be more adequately explored.

Turning now to Dellefield's assignment of his Third National stock, we have a wholly different picture. There has been some suggestion that Dellefield was so under the influence of morphine as to make the transaction invalid. Nevertheless plaintiff ultimately repudiated any contention that his faculties were so impaired, the nurse testified otherwise, and plaintiff showed the contrary by her actions in asking his advice as to whether or not she should make the transfer. The nurse said that the morphine might put him to sleep unless he was talked to, but the evidence shows that he was talked to and was quite awake. It is clear that his will was not overborne; and, indeed, plaintiff's claim is fraud, not lack of capacity. Hence the court did not even submit this issue to the jury, but went so far as to say that "the plaintiff does not pretend that any statement of fact, either false or true, or any misrepresentation, was made to Mr. Dellefield before he executed the assignment on the back of the certificate." But the court developed an interesting theory that the fraud came later when plaintiff told her husband, as she testified, that Block had said the stock was worthless. The court allowed the jury to infer that this reference by plaintiff was also intended to include the Third National stock and to find that when Dellefield made no objection he accepted the misrepresentation as a statement of fact and thus ratified the transaction on the basis of the deceit. It seems obvious that this theory will not stand analysis. Whatever representations were made by Block were made to plaintiff to persuade her to do what she did; there is no showing of any intent on Block's part to mislead Dellefield, much

less of this complicated plan that after the transfers were all completed she should lull her husband into nonaction by repeating what had been told her.

But even had there been such an intent, we do not see how there could be any actionable representations here. For even though plaintiff claimed that her husband, too, relied on Block's superior business ability, yet there is nothing to show that there was any impropriety or unnatural quality in such reliance or that the president and treasurer, who had also been an active manager of this line of business for nearly ten years, could be properly held to be imposed upon as to realty values by an expression of judgment by his business associate. After all, there was nothing in the Third National situation to mislead Dellefield. The company owned certain subdivisions which it hoped to sell; it is fantastic to think that he should not have had as much guess about the future of that business in 1935 as his associate. See Gordon v. Butler and other cases cited above. There was not sufficient evidence of deceit as to the Third National transaction to be submitted to the jury, and defendants' motion for a directed verdict on this claim should have been granted.

(2) *Admissibility of the Block Story.* On several different occasions during the trial defendants attempted to offer defendant Louis Block's testimony as to his dealings with Dellefield on September 24, 1935, to show how, according to their claim, the transfers actually came about. On each occasion the court excluded the testimony on the ground that under the New York Civil Practice Act, § 347, testimony of transactions with a person now deceased was not admissible except as claimants from such persons had testified; and that, as applied to the circumstances, plaintiff's evidence had only opened the door to evidence of incidents occurring on September 28. Notwithstanding rather vigorous contentions of counsel, the trial court consistently excluded all discussion between Block and Dellefield as to the actual transfers; since Block had denied the affair of the 28th, and that claimed by him on the 24th was another "transaction," it was thus considered wholly inadmissible. It is, of course, clear that such exclusion involved a crucial issue in the case and might well have been determinative of the result. The Block story, limited to a mere barren denial, without explanation of how

the stock found its way to its ultimate destination, could not be so effective as a denial supported by a circumstantial account of what actually occurred.

A preliminary question occurs as to whether the offer of proof was adequate enough so that we can discern what was the intended evidence and determine its materiality. A part of the argument had below on the point was out of the presence of the jury and does not appear in the record. Doubtless because it was so obvious to the participants, counsel did not make a statement for the record of what he expected to bring out. He did say, however, that the purport of such testimony would be to give Mr. Block's version of the very transaction testified to by plaintiff. In the view of the writer that is adequate to show us that argumentative or circumstantial support of the denial by another version was intended, and that such support was material and important. In any event, however, the claim is made clear by the explicit terms of the answer sworn to by Block and filed in the action, wherein Block stated that on September 24 Dellefield proposed that he would cause the Blockdel stock to be returned to the company for a credit of its face value on the corporation's claim against him, sell his Third National stock for the amount of his original investment in it in the spring of 1935, and, notwithstanding his illness, work on advertising material for the corporations as much as he could in Chicago and receive a salary of $100 a week for a year; that Block accepted the proposal; and that it was carried into effect as agreed, the deceased causing his wife to endorse and surrender the certificate on that date (which is the date endorsed on the certificate), and all payments being made as promised. In short, the contention was that the Dellefields should and did receive the face value of their stock, plus an agreed-upon salary for Dellefield for a year, even though he might not be able to do any substantial amount of work.

■■ The materiality of this evidence is obvious. Plaintiff claims that even had it been admitted it was clearly false and that the jury has shown that it would not have believed it. But there is nothing inherently unbelievable in the story, and, if admissible, the jury was entitled to judge its truth or falsity. The only question, therefore, is whether or not its exclusion was proper. This has been treated below.

as a question under the New York statute which was one of the so-called Dead Man Statutes now so much criticized as instruments of injustice,[1] as well as of confusion in trials.[2] We shall follow the same course, only noting that this may not be in the spirit of federal procedure, where disqualification because of interest has not been received with favor, Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L. Ed. 369, 93 A.L.R. 1136 (refusing to retain the wife's disqualification to testify for her husband in a criminal case), and where the new Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, have attempted to liberalize admissibility of evidence as much as possible by providing always for the widest rule of admissibility, whether federal law or federal equity or state rule. Federal Rules of Civil Procedure, rule 43(a).[3] But considering the New York statute alone, we think the proffered testimony was admissible.

The New York Civil Practice Act, § 347, so far as here pertinent, is as follows: "Upon the trial of an action * * * a party or a person interested in the event * * * shall not be examined as a witness in his own behalf or interest * * * against the executor, administrator or survivor of a deceased person * * * concerning a personal transaction or communication between the witness and the deceased person * * * except where the executor, administrator, survivor * * * is examined in his own behalf * * * concerning the same transaction or communication." It will thus be seen that on a claim in favor of or against the administrator of a deceased a party cannot testify to the personal transaction or communication between himself and the deceased except where "the door has been opened" by testimony of the administrator in his own behalf concerning the same transaction or communication.

So far as the Blockdel transaction is concerned, the statute appears to us entirely inapplicable. Here we have no claim affecting the deceased person directly; it is the plaintiff, not her husband, who has been imposed upon. In terms the New York statute does not apply, and only ordinary rules as to hearsay would be applicable. But under them the testimony would be admissible as controverting plaintiff's case and as showing a transaction with plaintiff's agent, her husband, in her behalf which is inconsistent with her testimony. It had appeared generally, even from plaintiff's own story, that she quite naturally followed her husband's advice and directions in all business matters, that, as she claimed, she knew nothing about business herself, that she had made him her proxy at stockholders' meetings of the corporation, and that, indeed, in this very transaction she sought his advice before acting. There was sufficient evidence of his authority to represent her. Moreover, decisions under the statute make its inapplicability clear under these circumstances.

---

[1] 2 Wigmore, Evidence, 3d ed. 1940, §§ 578, 578a, 5 id. § 1576; Rep. of Section of Judicial Administration, 63 A.B.A. Rep. 581, 597; A.L.I.Code of Evidence, Proposed Final Draft, Mar. 16, 1942, 30–35; Morgan et al., The Law of Evidence; Some Proposals for Its Reform, 1927, 24–34; Taft, Comments on Will Contests in New York, 30 Yale L.J. 593, 605; Ladd, Admission of Evidence Against Estates of Deceased Persons, 19 Iowa L.Rev. 521; Ladd, The Dead Man Statute: Some Further Observations and a Legislative Proposal, 26 Iowa L.Rev. 207, 229–240; Callahan and Ferguson, Evidence and the New Federal Rules of Civil Procedure: 2, 47 Yale L.J. 194, 198. Originally designed to modify the hearsay rule, which closed the mouth of a dead man to the injury of his estate, these statutes now give an undue advantage to the representatives of the deceased as to what part of the story shall be disclosed. See particularly Morgan, Taft, and Ladd, supra.

[2] In Morgan, supra note 1 at 34 (the Report of the Commonwealth Fund Committee recommending legislation along the line of that long existing in Connecticut and Massachusetts), and in A.L.I.Code of Evidence, supra note 1 at 32, are statistics of the number of cases arising on these statutes in the various states. In New York, up to 1921, the statute had been interpreted 324 times; and an entire book has been written on it: Greenfield, A Treatise on Testimony under § 347, Civil Practice Act, 1923. For the Connecticut statute applied in federal procedure, see Dysart v. Remington Rand, Inc., D.C.Conn., 40 F.Supp. 596.

[3] Applying limitations of this sort may make more pertinent some of the criticisms of the new rule as too vague and limited in its accomplishment, found in Green, The Admissibility of Evidence under the Federal Rules, 55 Harv.L.Rev. 197. Cf., also, Callahan and Ferguson, supra note 1; 3 Moore's Federal Practice 3067.

They allow statements of the deceased agent in claims by or against the principal. Hildebrant v. Crawford, 65 N.Y. 107; Platner v. Platner, 78 N.Y. 90.

It is true that defendants alleged in their answer that the stock was really owned by the deceased. Nothing appeared to show why the gift of the stock to plaintiff was improper or to sustain this claim. Had it been sustained, this matter might then have fallen into the same class as the Third National transaction we are now to discuss.

■■ With reference to the assignment of the Third National stock, the basic question is whether or not the offered testimony concerns a separate transaction from that testified to by plaintiff. We do not think the affirmative answer made below is logically or practically sound. It is true that the statutory terms have been construed rather narrowly, contrary to the spirit of modern views; and there has been a disposition to give full scope to its restrictive features. Compare Martin v. Hillen, 142 N.Y. 140, 144, 36 N.E. 803, 58 N.Y.St.Rep. 617; Matter of Callister, 153 N.Y. 294, 47 N.E. 268, 60 Am.St.Rep. 620. Clearly, however, what is "the same transaction" and how far the door has been opened are not questions to be posed in vacuo, but only with reference to the facts of the particular case. Here Block was not making an affirmative claim on the basis of his conversation with Dellefield; had he so attempted there would be little question but that the transactions were not the same. He was, however, only strengthening the denial he was entitled to proffer by giving the true story. Moreover, this was not a showing of some quite remote acts of the deceased tending indirectly or remotely to cast doubt upon the administratrix' story; instead, it concerned the very act which was the basis of her case, namely, the signing and delivery of the stock assignment. That it is asserted to have happened on the day when plaintiff opened her negotiations, rather than when she closed them, seems too small a distinction to make the testimony new matter; the essential is that it is testimony necessarily referring to the one matter of the assignment and putting a different light upon it. Essentially rebuttal testimony has been held admissible under the statute; and we think the following, among others, support admissibility here. Lewis v. Merritt, 98 N.Y. 206; cf. Id., 113 N.Y. 386, 21 N.E. 141, 22 N.Y.St.Rep. 714; Nay v. Curley, 113 N.Y. 575, 21 N.E. 698, 23 N.Y.St.Rep. 496; Mitchell v. Cochran, 57 Hun 589, 10 N.Y.S. 545, 32 N.Y.St. Rep. 374; Kings County Trust Co. v. Hyams, 242 N.Y. 405, 152 N.E. 129; Minns v. Crossman, 118 Misc. 70, 193 N.Y.S. 714; In re McArdle's Estate, 140 Misc. 257, 250 N.Y.S. 276; In re Fisch's Estate, 147 Misc. 552, 264 N.Y.S. 260; In re Van Muffling's Estate, 154 Misc. 300, 277 N.Y.S. 584; In re Frothingham's Will, 161 Misc. 317, 291 N.Y.S. 656. See, in general, Greenfield, A Treatise on Testimony under § 347, Civil Practice Act, 1923, c. 10, "Opening the Door," §§ 223–246.

We therefore hold the exclusion of this testimony prejudicial error.

(3) *The Damages.* As was to be expected from the nature of the case, a large part, indeed the larger part, of the lengthy trial was devoted to the issue of damages. The simple rule fixing damages as the market value of the stock at the time of the fraud obviously could not be directly applied to these closely held corporations, whose stock had no ascertainable market value. Hence the parties attempted to prove actual value by showing the net worth of each corporation. The nature of the evidence produced, the refusal to admit certain other evidence, and the court's charge are all subjects of controversy here.

Neither corporation had paid a dividend. The two principal officers, as well as others, had drawn substantial salaries from Blockdel from the beginning. The only benefits flowing from the corporations to the parties interested were these salaries. Nor had either corporation paid dividends at the time of trial. On the other hand, there was evidence that in 1938 the Blocks had advanced substantial sums to Blockdel by way of loan.

Turning now to the details of the proof, we shall limit our statement to the affairs of Blockdel. For what we say has perhaps even more direct application to Third National, where the evidence of real value was even scantier, due in part to its brief existence. For its about six months of operation it showed a net loss for the period and a net deficit in excess of $5,000, turned into a surplus only by the dubious process hereinafter described of rejecting a reserve set up against accounts receivable and valuing the latter at par.

Plaintiff's evidence as to Blockdel consisted primarily of the yearly corporate balance sheets showing assets and liabilities, together with income and expense statements, for the years 1931 to 1935, inclusive. Initially the court expressed an unwillingness to accept proof of only book value of the stock, but in view of the dearth of other evidence it accepted what was presented. It is not too much to say that these balance sheets, together with inferences erected on top of them, were the plaintiff's case; for such other evidence as was produced fell into insignificance after the lengthy and leading examination of plaintiff's expert accountant, who went over the items of the several years in great detail and built up extensive deductions from them. Other items of evidence either duplicated or were overshadowed by these figures. Thus federal capital stock tax returns simply repeated the capital stock and surplus items of the balance sheets. And plaintiff introduced tax bills for three years covering the individual subdivided lots of the company. But this made a stack of documents three feet high; and on a good share of them, indeed those for the crucial year 1935, the assessments were not even stated. Even if assessed value be considered important, this mass of undigested material was of no value to the jury and could not have been examined by it in the brief time it was out before rendering its verdict. Moreover, when defendants' bookkeeper asserted an assessed value of $209,000 for all the lots, plaintiff attempted to break that down—and probably succeeded with the jury—by showing that it was limited to lots not yet sold. Actual figures, therefore, came from the accountant's interpretation of the balance-sheet figures; of these, there was a profusion of many numbers and of large amounts. The greater part of the rather brief charge was devoted to the issue of damages as to Blockdel. (Damages as to Third National were not even mentioned.) Plaintiff's several claims on these matters were set forth approvingly; defendants' claims were, for the most part, not mentioned at all.

▆▆ The nature of the corporate business would seem not such as to require so limited proof of corporate worth. The two most natural items of assets would be (1) the value of the unsold lots and (2) the value of the uncompleted installment contracts for the purchase of lots. These contracts, developed as the result of extensive advertising and activities of sales agents, called for payments by the purchasers, apparently usually on the monthly basis over a period of five years. The sales price of the lots varied; one estimate gave $400 as an average. The evidence also showed a high percentage of cancellations; one statement by Block covering a period of three years and a half, 1931–1934, showed cancelled business substantially in excess of that actually consummated. Certainly the unsold land could have been valued by competent real estate experts. There seems no reason why some informed conclusion could not have been obtained and offered also as to the value of these contract claims. With such valuation, and with the addition of any other clear assets (at most only minor here) and a deduction of corporate liabilities, the jury would have had a basis for adjudging corporate worth, and thence the value of the individual shares.

Since this course was not pursued, the balance sheets, notwithstanding some obvious uncertainties and limitations, cf. Oxford Paper Co. v. United States, Ct. Cl., 52 F.2d 1008, 1010; Merriam v. Wimpfheimer, D.C.S.D.N.Y., 25 F.Supp. 405; In re Foster's Estate, 239 App. Div. 806, 264 N.Y.S. 913, affirmed 263 N.Y. 639, 189 N.E. 735; Winter v. Anderson, 242 App.Div. 430, 435, 275 N.Y.S. 373, 380, would have some probative value. They might be treated as in effect admissions, at least partial, or corporate worth made by the corporation's accountant, accepted by its officers, and reported to its stockholders. The question still remains how far the admissions should be pressed under the circumstances.

Actually we do find as the two largest assets on all the balance sheets the items "Accounts Receivable" and "Land and Land Improvements." Thus, in the statement of December 31, 1935, the first item appears in the amount of $333,716.47, the second, $735,766.03. The chief offsetting liabilities are habitually two reserves; as they appear in the 1935 statement they are "Reserve for Unrealized Gross Profits on Sales, $175,906.76" and "Reserve for Land Improvements, $397,485.68." With respect to the latter, the testimony showed that this referred only to estimated cost of improvements to be made, and that such cost had not been actually incurred or even contracted for. That is, it consisted of amounts reserved for grading, laying out

lots, streets, and so on, which were considered reasonably necessary before the land could be sold. To obtain the cost of the land, which included original cost and actual expenses of improvements made, it was necessary to deduct the reserve for land improvements from the land asset. There also appeared as current liabilities, "Loans Payable" and "Mortgages Payable" —$186,849.38 and $112,614.80 respectively in the 1935 statement. It will be noticed that these liabilities very nearly offset the item of land assets; and that was generally true also on the earlier balance sheets. (Plaintiff attacks the loan item as including excessive amounts due corporate officers; that issue is discussed below.)

That leaves the matter of the accounts receivable as most important, and, indeed, it was the most bitterly controverted issue. Other admitted assets included only some cash on hand, also "Advances to Officer," which is the Dellefield account, the subject of the counterclaim herein, as well as some small amounts of fixed items and deferred charges, such as office furniture and advances to salesmen; and there were various small liabilities to offset them. The dispute as to the accounts receivable centered on the point whether this item should be carried at face value or less the reserve for unrealized gross profits. Or stated differently, but with the identical result, it was whether or not this reserve should be added to the final items on the liability side, namely capital stock and surplus, to show corporate worth. On the 1935 statement the capital stock stood at $15,000 ($20,000 authorized, less the Dellefield stock now treated as treasury stock), with surplus of $233,944.64. It thus appears that so far as the statement admits corporate worth, it is just under $250,000, while plaintiff's claim would make the figure $424,850.-40.

Plaintiff's accountant asserted, however, that this reserve for unrealized gross profits must be added to the surplus (or wiped out as a deduction from assets) to show the value; and this contention must have been accepted by the jury. In its charge the court left the analysis of these balance sheets to the jury, "in the light of such testimony of the accountants as you accept, or the other witnesses," adding only a statement of plaintiff's three claims of increases: (1) the wiping out of this reserve as a deduction (2) the addition of good will, and (3) the reduction of the debits to corporate officers. On all three of these claims the jury was left in effect with a direct suggestion to find in accordance with plaintiff's contentions.

As supporting reasons for wiping out this reserve and accepting the accounts receivable at par, plaintiff's accountant relied on two points: that the profits though not yet collected were due under contracts already made, and that, even if cancellations occurred, the land was retained and went back into that item of assets. But these reasons are obviously inadequate. As to the first, it is clear that the future returns must be discounted to present values, and, moreover, some provision must be made for the expenses of collection, which, as the expense sheets show, and as would be expected in this type of installment selling, must be very substantial each year. As to the second, it would be indeed anomalous if broken contracts proved a real sign of corporate worth. Their effect on good will is discussed below; here it should be noted that upon cancellation the item of accounts receivable was reduced by the face of the contract, and the reserve for profits by the expected profit, while the asset for land would be increased only in the unmarked-up value, which appears to have been usually about one-half the sales or contract price. In other words, cancellations did have an unfavorable effect upon book values.

There was, therefore, no credible testimony on behalf of plaintiff adequate to controvert the deduction of this reserve, or to suggest some other more appropriate deduction in determining the admitted book value to the corporation. On the other hand, defendants' accountant, who had prepared all these statements in the successive years and who was familiar with the corporate affairs—as plaintiff's expert was not —did give some expression of value for the accounts. His reliability was vouched for by both parties, since plaintiff had called him earlier to explain the items affecting land and improvements. When called by defendants, and particularly upon questioning by the court, he stated that he himself would pay about half value on the accounts, or $150 on a $300 claim; that the real value was approximately the value of the land before it was marked up for sale, or one-half the sales price; that perhaps 75 per cent of the accounts would be considered collectible; but that a 75 per cent value could not be ascribed to the item except on the assumption, contrary to fact, that all would be paid during the year

to which the balance sheet referred. He also gave examples from the balance sheets indicating his estimate of about half value. As matters stood, therefore, the jury should have been limited to either the admitted worth—that is, after deducting the reserve —or such modifications as it chose to make upon the basis of this testimony. In no event should face value have been permitted.

 Further, as In re. Foster's Estate and other cases cited above show, the matter of earning power was very important and prospects thereof could easily modify substantially any showing of mere book value. There was considerable evidence, particularly in the income and expense statements, to show a substantial decline in corporate earning power during the period covered by the evidence. In 1931, sales of improved lots numbered 1,585; in 1935, they were down to 152. In the earlier years, accounts receivable were over a million dollars; they had fallen in 1935 to the amount stated above. In 1932 and 1933, receipts from cancelled contracts were 93 and 75 thousand dollars, and net "profits" 71 and 60 thousand dollars. By 1935, a net loss of $2,921.81 was shown. Indeed, the only substantial profits ever admitted came from, and in the years when there were, large receipts from cancelled contracts, i.e., when the business was in reality going badly. Defendants offered in evidence further statements from 1936 to 1940, inclusive, which were rejected on plaintiff's objection and which would have shown that this trend of decreased sales and of lessened accounts receivable, as well as of substantial deficits in the income and expense account, steadily continued. The charge should have covered these matters. It did not, but, on the other hand, authorized the jury to find extensive good will as an asset to be figured on certain capitalizations of earnings over a five-year period.

 With reference to good will, plaintiff's accountant, while claiming no real experience in real estate subdividing, had testified generally that business corporations were entitled to good will computed as a capitalization of earnings. On the basis of his computations he gave estimates of good will for this corporation, running from about $85,000 to more than $312,000. Defendants' accountant, from his familiarity with the business, testified that there was no good will here, both because of the kind of business and because of the particular circumstances of this company. Thus he said that there was no tendency of customers once sold to return for more lots, and that it was necessary in every case, by process of advertising and agent pressure, to create a new market. Furthermore, the business of this company had gone downhill in the depression era. Under the circumstances we think there was no adequate evidence supporting an addition to corporate assets for good will.

 We add also that we think the exclusion of the later balance sheets was error under the circumstances. Had there been good evidence of value at the time in issue, later values would have been at least unnecessary and perhaps misleading. But under the circumstances there was grave danger that the figures already admitted might mislead, and the proper corrective of the full history of the corporation should have been allowed. Evidence of value after the time in issue has been admitted when value at the time may be illusory. Whiting v. Price, 172 Mass. 240, 51 N.E. 1084, 70 Am.St.Rep. 262; Kelsea v. Fletcher, 48 N.H. 282; cf. Hubbell v. Meigs, 50 N.Y. 480, 491; 2 Wigmore, Evidence, 3d Ed. 1940, § 463. Further, there had been considerable evidence of various facts relating to the later period, and plaintiff's evidence as to good will had been based directly on the fact that the company had continued in business apparently satisfactorily. Under the circumstances the offer was one of direct rebuttal testimony. Also offered and excluded was an analysis of what actually happened to the accounts receivable of 1935, which likewise appears to be appropriate rebuttal under the circumstances.

 The court also allowed the jury to find in favor of plaintiff's claim that the loans owed by the corporation should be reduced by approximately $120,000, as being improper credits to Koff, Block, and Sargol. These were for undrawn salary in the early years of the business and for interest on money advanced initially to the corporation. Plaintiff's accountant attacked these items as excessive or unearned, but outside of his opinion there was no supporting proof beyond a showing that the time spent for the corporation was not great. And there would seem no reason why the interest charges were not appropriate. Moreover, this was not a suit by creditors, but one by a stockholder;

and even if the claim of excessive credits could be substantiated, it would seem not one which this plaintiff could make. The original arrangement whereby the business was set up called for the initial payment of these salaries. All during the period involved Dellefield was the owner of the stock, as well as an active officer of the corporation. Thereafter, when plaintiff became a stockholder, she gave her proxy to Dellefield, who, at stockholders' meetings, as well as directors' meetings, voted to confirm these items. The court allowed the jury to find that "Dellefield acted mechanically and without intelligence" in making these approvals. The only evidence lending support to this is plaintiff's general claim of her husband's reliance upon the superior business judgment of Block. This does not seem adequate to justify a conclusion that he was imposed upon as to matters of this long standing in the company and in which he had participated, or that plaintiff claiming at most through him can now attack them.[4] Hence there was not sufficient evidence to justify the charge permitting the expunging of these debits.

■■■ The final claim as to the Blockdel damages concerns the respective ownership of the corporation as between Mrs. Block, in whose name stood 150 shares of the corporate stock, and plaintiff, who had 50 shares. The court allowed the jury, if it found that Mrs. Block's purchase of the Koff stock was made with company funds, to find that 75 of her shares were treasury stock, and that the corporation was therefore owned 50/125 by plaintiff and 75/125 by Mrs. Block. The transactions were highly complicated and were never clearly explained before the jury. Without going into details here it may be stated that the defense involved a use by Mrs. Block of funds due from the company to her husband and assigned to her to make loans in 1932 and 1933 to Koff when he was in trouble, and that these loans and Koff's claim against the corporation were settled in 1935 at a large reduction in their face value. The credits to Block employed by his wife in this transaction were in part those he acquired directly from the corporation and in part those he procured from

Sargol when the latter disposed of his interest in the company. Since we have already sustained these credits as against plaintiff, the jury should have been told that their use to purchase Koff's stock would not make the stock the property of the corporation.

■■■ As the case went to the jury, plaintiff's counsel was allowed to claim an actual value of the corporation of from 600 to almost 860 thousand dollars, of which plaintiff was entitled to 40 per cent. This made a possible value for each share of her stock of about $6,860. On the conclusions which we have just stated, there was not adequate basis for a maximum award of more than one-quarter of the greatest corporate value shown, to wit, $250,000, or about $1,250 per share; and this would not take into consideration the evidence of decreasing earning power of the corporation. The jury actually made an award of $3,560 per share. Defendants made objections throughout to the proof of damage and tendered specific requests to charge on this issue; their exceptions to the refusal of the court so to charge were noted by the court generally when it stopped them from stating separate exceptions. The errors with respect to the issue of damages were therefore clearly prejudicial.

Moreover, the prejudice goes beyond the issue of damages itself and affects also the primary issue as to the existence of any fraud. Had the jury not believed that the Blocks did plaintiff out of a very valuable property, it would undoubtedly have had more question whether Block's statement as to the value of the stock was not opinion, but a false representation. But for this the equities were not strongly in plaintiff's favor. Here Dellefield had received salary for thirteen years, totalling in excess of $150,000, without initial investment or any financial risk on his part. The value of the corporations was therefore the cornerstone of plaintiff's case.

■■■ *The Judgment.* Only remaining for further consideration are the judgment on the counterclaim and the so-called equitable judgment. The counterclaim, based on Dellefield's withdrawals or overdrafts from the corporation, all care-

---

[4] Note that under Federal Rules of Civil Procedure, rule 23(b), 28 U.S.C.A. following section 723c, and former Equity Rule 27, 28 U.S.C.A. § 723, Appendix, a shareholder in a shareholder's action can complain only of acts done while he was a shareholder, except where his shares have devolved upon him by operation of law.

fully listed, seems to have been adequately proved except perhaps as to the initial charge of $5,000 for the stock issued to him. The account was accepted by him without challenge, as the various balance-sheet statements attest. The court should have set forth these considerations more thoroughly in its charge, and the verdict and judgment upon the counterclaim therefore cannot stand. As to the so-called equitable judgment on the Third National claim, that would in any event fall with the main judgment. We need say further only that although it probably is not harmful we see no reason for the duplicating entry. Under the blended system of law and equity, only one money judgment is necessary and no other should have been entered.

The trial herein was long and arduous. The principals readily answered the leading questions of their counsel; but they observed great circumspection and unusual reticence as to questions of opposing counsel, and were devotedly shielded by protective objections. Long and dreary testimony as to the separate items of balance sheets already in evidence served to confuse, rather than to clarify, the picture. In view of the extensive examinations had before trial and of the nature of the book evidence, a large part of the proof should have been stipulated to by the parties and the trial agreeably shortened. Perhaps, in view of the attitude of the parties, we can hope only to approximate justice in this litigation. Even so, a new trial is now required.

The judgments are reversed and the action is remanded for further proceedings in accordance with this opinion.